Benjamin Berger, Bar No. 220394
BERGER ♦ HARRISON, APC
24031 El Toro Rd., Suite 200
Laguna Hills, CA 92653
(949) 548-1700 / Fax: (949) 548-1001
bb@bergerharrison.com

JoyAnn Kenny (*pro hac vice to be submitted*)
FISHER ZUCKER LLC
21 South 21st Street
Philadelphia, Pennsylvania 19103
(215) 825-3100

Attorneys for Plaintiff
FIT BODY BOOT CAMP, INC.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIT BODY BOOT CAMP, INC., <br><br> Plaintiff, <br><br> v. <br><br> JUSTIN SMITH, an individual; and DOES 1 through 10, inclusive, <br><br> Defendant. | CASE NO. <br><br> **Assigned For All Purposes To:** <br> **Judge:** <br> **Magistrate:** <br><br> **COMPLAINT FOR:** <br> 1. **Breach of Contract - Operation of the Competing Business;** <br> 2. **Trademark Infringement and Unfair Competition;** <br> 3. **Misappropriation of Trade Secrets; and** <br> 4. **Breach of Contract – Unpaid Royalties** |

## INTRODUCTION

1.    Fit Body Boot Camp, Inc. is the national franchisor of Fit Body Boot Camp locations nationwide.

2.    The Defendant is a franchisee, still in his first term, who has opened and continues to operate a directly competing business with the Plaintiff and its franchisees.

- 1 -

BERGER
♦
HARRISON

3.      The true names and capacities, whether individual, governmental, corporate or otherwise, of Defendants DOES 1 through 10, are presently unknown to Plaintiff, who therefore sues said Defendants, and each of them, by such fictitious names. Plaintiff is informed and believes and based thereon alleges that each of the Defendants' named as DOE is responsible in some manner for the damages to Plaintiff as herein alleged, or has an interest in the relief sought herein, and Plaintiff will seek leave of this court to amend this Complaint to show their true names, identities, and capacities when the same have been ascertained.

4.      Plaintiff is informed and believes, and based thereon alleges, that each Defendant, including DOES 1 through 10, at all times mentioned herein, was the agent and servants of each other Defendant and at all times pertinent hereto was acting within the course and scope of said employment and agency.

5.      The Defendant continues to the use the Plaintiff's trademarks, business systems, and bargained for location to market and run his directly competitive business.

6.      The Defendant owes a certain sum of unpaid fees pursuant to the terms of his Franchise Agreement.

7.      Fit Body Boot Camp commences this action to enforce its in-term noncompete rights and to protect its valuable trademarks by seeking an injunction that enjoins Defendant from operating the competitive business and using Fit Body Boot Camp's trademarks and its proprietary business system in the operation of his competitive business, as well as to recover unpaid royalties.

## **PARTIES**

8.      Plaintiff, Fit Body Boot Camp, Inc. ("Plaintiff" or "Fit Body"), is a California corporation with its principal place of business located at 5867 Pine Avenue, Chino Hills, California 91709.

///

9.     At all times referred to herein, Fit Body has engaged in business as the national franchisor of Fit Body Boot Camp franchises, which offer fitness, exercise, personal and related services to certain customers in both retail and virtual capacities under the mark "Fit Body Boot Camp."

10.     Defendant, Justin Smith ("Defendant" or "Smith"), is an individual, resident and citizen of California with an address of 16520 Green Valley Truck TRL, Ramona, California 92065.

11.     Smith operates his Fit Body Boot Camp location at 13125 Danielson Street, Suite 101, Poway (the "Premises")

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338 in that Plaintiffs' claims against Defendant are based upon trademark and trade dress infringement under the Lanham Act, 15 U.S.C. §1051 et seq.

13.     Venue for this action is predicated upon 28 U.S.C. §1391(b) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## BACKGROUND

14.     On March 11, 2020, Fit Body and Smith entered into a Franchise Agreement, pursuant to which Smith obtained the right and undertook the obligation to operate a Fit Body Boot Camp franchise for seven (7) years (the "Franchise Agreement").  A true and correct copy of the Franchise Agreement is attached as Exhibit "A."

15.     Fit Body is the licensor of trademarks registered at the United States Patent and Trademark Office on the Principal Register as follows: (herein the "Marks"):

| REGISTRATION NO. | EFFECTIVE DATE OF REGISTRATION | MARK |
|---|---|---|
| 3852206 | September 28, 2010 | FIT BODY BOOT CAMP |
| 5329068 | November 7, 2017 | FIT BODY BOOT CAMP |

16. Fit Body provides a variety of fitness services, as well as a comprehensive System (herein the "System") that includes the Marks, know-how relating to Fit Body Boot Camp Services and Products, advertising, marking, sales techniques, and training programs.

17. Fit Body and franchisees are licensed to use the Marks to operate under Fit Body's business system pursuant to the terms and conditions of the Fit Body Franchise Agreement entered into by each franchisee.

18. Fit Body's franchisees are also licensed to use Fit Body's proprietary business policies, procedures, standards, and specifications for operations, all of which are disclosed to Fit Body franchisees in confidence.

## NON-COMPETITION

19. Under each Franchise Agreement, Fit Body's franchisees have agreed to abide by an in-term noncompete agreement (the "Noncompete").

20. In relevant part, the Noncompete reads:

> In consideration for the use and license of such valuable information, you agree and covenant that, during the Term, except as otherwise approved in writing by us, neither you, nor any of your officers, directors, members, managers, shareholders, partners or owners, nor your spouse or the spouse of any of the aforementioned individuals (each a "Bound Party" and collectively, the "Bound Parties") will, directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person, persons, partnership, limited liability company or corporation: (i) operate, manage, own, assist or hold an interest in (direct or indirect as an employee, officer, director, shareholder, manager, member, partner or otherwise), or engage in, any "Competing Business". The term "Competing Business" means any business operating or granting franchises or licenses to others to operate a fitness

- 4 -

business or business offering or selling goods or services equivalent to Fit Body Boot Camp Services and Products or similar to the Franchised Business.

21.    On or about November 17, 2022, Plaintiff became aware that Defendant began operating a business under the name of "Smith Health and Fitness" with a website at getsmithfit.com.

22.    Plaintiff subsequently wrote to Defendant regarding his failure to comply with the Noncompete. See Exhibit "B" (the "Default Notice").

23.    Defendant did not respond to the Default Notice.

24.    Smith remains in operation of the Competing Business.

## FRANCHISEE'S USE OF FIT BODY'S TRADEMARKS
## IN COMPETITIVE BUSINESS

25.    Pursuant to Section 11.1(b) of the Franchise Agreement, Defendant agreed to maximize Fit Body's business.

26.    Specifically, Defendant agreed not to "(i) *divert or attempt to divert any business or customer of [Fit Body] to any competitor, by direct or indirect inducement or otherwise, or (ii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System.*"

27.    Smith Health and Fitness is a competitor of Fit Body because it is another fitness business that utilizes the same style of thirty-minute, high intensity training. Below is a screenshot of Smith Health and Fitness' website:



COMPLAINT

28.    Images from the getsmithfit.com website show instances where Smith Health and Fitness is using the Marks:





29.    Defendant continues to utilize the Marks in his competing business.

30.    Plaintiff brings suit to enforce its rights and protect its valuable Marks and System from Defendant's unfair competition, infringement, and material breach of contract.

**ROYALTIES**

31.     Pursuant to Section 4.2(a) of the Franchise Agreement, Defendant is required to pay Fit Body a monthly Royalty of $997.

32.     Pursuant to Section 4.2(b) of the Franchise Agreement, Defendant is required to pay Fit Body a monthly Software Reimbursement Fee of $300.

33.     Pursuant to Section 4.3(a) of the Franchise Agreement, Defendant is required to pay Fit Body a monthly Marketing and Promotion Fund Contribution of $500. The Royalty, Software Reimbursement Fee, and Marketing and Promotion Fund Contribution are collectively referred to herein as the "Royalties."

34.     Pursuant to Section 4.7(a) of the Franchise Agreement, any late payment of the Royalties is subject to a late charge of five percent (5%).

35.     Pursuant to Section 4.7(b) of the Franchise Agreement, all delinquent Royalties bear interest from the date payment was due at an annual percentage rate of eighteen percent (18%).

36.     As of the date of this Complaint, Defendant has failed to pay Royalties of $10,382.00, as shown on the Statement, a true and correct copy of which is attached as Exhibit "C."

## COUNT I

## BREACH OF CONTRACT – OPERATION OF THE COMPETING BUSINESS

37.     Plaintiff incorporates by reference the facts set forth in paragraphs 1 through 34 above as though set forth at length herein.

38.     Defendant is still under the initial seven-year period of the Franchise Agreement. The Franchise Agreement has not expired, it has not been terminated, and it has not otherwise ended.

39.     Defendant is engaged in the business of operating a competing fitness facility and offering program services at the same Premises where he

operated a Fit Body Boot Camp franchise.

40.    The acts, practices and conduct of Defendant in operating the Smith Health and Fitness business constitute a material breach of the Franchise Agreement and constitute a misuse of the Marks, confidential information and System.

41.    Plaintiff has been and will continue to be irreparably harmed by the Franchisee's operation of a Competing Business at the Premises.

42.    WHEREFORE, Plaintiff Fit Body Boot Camp, Inc. demands that Defendant Justin Smith be preliminarily and permanently enjoined and restrained from having any other interest in, or involvement in the operation of, any business whether for compensation or not, in any capacity whatsoever, which is directly or indirectly, in competition with Fit Body Boot Camp, Inc. or its franchisees during the term of his Franchise Agreement and for a period of one year after the termination of his Franchise Agreement, attorney's fees and costs incurred in bringing this action pursuant to Section 14.4 of the Franchise Agreement, and such further relief as this Court deems just and proper.

## COUNT II

## TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

43.    Fit Body incorporates by reference the facts set forth in paragraphs 1 through 40 above as though set forth at length herein.

44.    Defendant has utilized and benefitted from the Marks in operation of Smith Health and Fitness without authorization from Fit Body.

45.    Defendant willfully intended to trade on Fit Body's reputation and cause dilution of the Marks.

46.    Defendant is guilty of trademark infringement pursuant to the Lanham Act, 15 U.S.C. §1051, et seq.    Defendant's usage of the Marks constitutes a false designation of origin and is likely to cause confusion, mistake or deception as to it being affiliated, connected or associated with Fit Body in

- 8 -

violation of 15 U.S.C. §1125(a). Defendant's conduct is also a violation of the common law of unfair competition and is an unfair trade practice under common law.

47. Defendant's continued operation as set forth above has caused and will cause Fit Body irreparable injury in that customers are being deceived by Defendant as a result of his continued use of the Fit Body's System and Marks; Fit Body will have difficulty franchising Defendant's trading areas, which includes the area Fit Body exclusively granted to Defendant; business will be diverted from Fit Body's Marks; Fit Body's Marks will be diluted and taken from Fit Body's control; and Fit Body will lose profits and revenues which, because of Defendant's conduct, cannot be readily calculated.

48. Fit Body has no adequate remedy at law because Fit Body cannot be adequately compensated for the deprivation and dilution of the consumer recognition and goodwill built up under the Marks as a result of Defendant's conduct.

49. Fit Body's immediate and irreparable harm will continue unless Defendant is enjoined from continuing to use of the Marks.

50. WHEREFORE, Plaintiff Fit Body Boot Camp, Inc. demands judgment in its favor and against Defendant Justin Smith as follows:

    a. A preliminary and permanent injunction enjoining Justin Smith and his agents, employees and any person acting in concert with him from infringing on Fit Body Boot Camp, Inc.'s trademarks in any manner whatsoever not licensed under the Franchise Agreement;

    b. An accounting of and judgment for the profits to which Plaintiff Fit Body Boot Camp, Inc. may be entitled as a result of Justin Smith's infringement;

    c. Treble damages pursuant to 15 U.S.C. § 1117;

    d. Punitive Damages;

e. Attorneys' fees and costs of this action pursuant to Section 14.4 of the Franchise Agreement; and

f. Such further relief as this Court deems just and proper.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS

51.  Fit Body incorporates by reference the facts set forth in paragraphs 1 through 48 above as though set forth at length herein.

52.  Defendant continues to make use of Fit Body's Marks and System through both his physical and internet presence.

53.  It is because of Fit Body's resources spent in educating Defendant in the System that Defendant has the trade knowledge to operate Smith Health and Fitness.

54.  Defendant knowingly used and continues to use Fit Body's System and Marks for his economic benefit in his operation of Smith Health and Fitness.

55.  Fit Body is injured by Defendant's actions by way of dilution of the Marks and Defendant's continuous use of Fit Body's System.

56.  WHEREFORE, Plaintiff Fit Body Boot Camp, Inc. demands judgment in its favor and against Defendant Justin Smith entering a preliminarily and permanent injunction that enjoins Defendant Justin Smith from utilizing any trade secrets of Plaintiff Fit Body Boot Camp, Inc. in any way that is not licensed under the parties' Franchise Agreement, attorney's fees and costs incurred in bringing this action pursuant to Section 14.4 of the Franchise Agreement and such further relief as this Court deems just and proper.

## COUNT IV

## BREACH OF CONTRACT – UNPAID ROYALTIES

57.  Fit Body incorporates by reference the facts set forth in paragraphs 1 through 54 above as though set forth at length herein.

58.  Defendant failed to pay Fit Body Royalties in the amount of

- 10 -

$10,382.00.

59.    As a direct and proximate result of the Defendant's breach of the Franchise Agreement, Fit Body has been damaged as a result of Defendant's failure to pay Royalties in the amount of $10,382.00 and late fees in the amount of $519.10.

60.    WHEREFORE, Plaintiff Fit Body Boot Camp, Inc. demands judgment in its favor and against Defendant Justin Smith as follows:

    a. Damages in the amount of $10,901.11 together with pre-judgment and post-judgment interest;

    b. Attorneys' fees and other costs incurred in bringing this action;

    c. Costs of this action; and

    d. Such further relief as this Court deems just and proper.


Dated: March 16, 2023                    BERGER ♦ HARRISON, APC

                                      By: _//s// Benjamin Berger_
                                         Benjamin Berger,
                                         Ian J. Pittluck, Attorneys for Plaintiff
                                         Fit Body Boot Camp, Inc.


Dated: March 16, 2023                    FISHER ZUCKER LLC

                                      By: _//s// JoyAnn Kenny_
                                         JoyAnn Kenny, _pro hac vice to be filed_
                                         Attorney for Plaintiff Fit Body Boot Camp, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT A**

## **FRANCHISE AGREEMENT**

COMPLAINT

BERGER
◆
HARRISON

# FIT BODY BOOT CAMP, INC.

## FRANCHISE AGREEMENT

**EXHIBIT A**

## TABLE OF CONTENTS

RECITALS .................................................................................................................................. 3
I.    DEFINITIONS ................................................................................................................. 3
II.   THE FRANCHISED BUSINESS ...................................................................................... 5
2.1   Our Business. ............................................................................................................... 5
2.2   The Franchise System. ................................................................................................. 5
III.  GRANT OF FRANCHISE ............................................................................................... 5
3.1   Grant of Franchise. ....................................................................................................... 6
3.2   Reserved Rights. ........................................................................................................... 6
3.3   Promotion and Development of Your Outlet. ................................................................. 6
3.4   Extent of Grant. ............................................................................................................. 6
3.5   Electronic Execution and Copies. ................................................................................. 7
3.6   Obligations of Entity Franchisee. .................................................................................. 7
IV.   PAYMENTS BY YOU ..................................................................................................... 7
4.1   Initial Franchise Fee ...................................................................................................... 7
4.2 Royalty and Other Recurring Fees and Payments. ......................................................... 7
4.3 Marketing, Advertising and Promotion. ........................................................................... 8
4.4 New Client Lead Generation Programs; Reciprocal Membership. ................................... 8
4.5 Electronic Funds Transfer. .............................................................................................. 9
4.6 Fees Fully Earned; No Setoff on Payments. ................................................................... 9
4.7 Late Fee; Interest on Delinquent Payments; Administrative Fee. .................................... 9
4.8 No Accord or Satisfaction. ............................................................................................... 9
V.    INITIAL TERM AND RENEWAL TERMS ...................................................................... 10
5.1   Initial Term. .................................................................................................................. 10
5.2   Renewal Terms. ........................................................................................................... 10
5.3   Month to Month Extension; Longer Notice of Expiration Required by Law. ................. 11
VI.   TRAINING AND ASSISTANCE .................................................................................... 11
6.1   Initial Training. ............................................................................................................. 11
6.2   Training and Assistance after Opening. ....................................................................... 12
6.3   Mandatory Meetings. ................................................................................................... 13
6.3   Proprietary Materials. .................................................................................................. 13
VII.  OPENING OF OUTLET AND FRANCHISED BUSINESS ............................................. 13
7.1   Approved Location; Your Outlet. .................................................................................. 13
7.2 Building Out Your Outlet. ............................................................................................... 14
7.3 Equipment, Furnishings, Fixtures, Signs, Decor and Initial Inventory. .......................... 15
7.4 Marketing and Advertising Boundaries. ......................................................................... 15
VIII. OPERATION OF FRANCHISED BUSINESS ................................................................ 15
8.1   Operational Requirements. .......................................................................................... 15
8.2   Brand Standards Manual. ............................................................................................ 16
8.3   Standards of Operation; Designated and Approved Suppliers. .................................... 17
8.4   Point of Sale System and Computer System. .............................................................. 18
8.5   Maintenance, Upgrades and Refurbishments to the Outlet. ........................................ 19
8.6   Relocation of Your Outlet. ........................................................................................... 19
8.7   Record Keeping and Reporting Requirements. ............................................................ 19
8.9   Telephone Numbers. .................................................................................................... 20
8.10  Insurance. .................................................................................................................... 20
8.11  Review and Inspection. ................................................................................................ 21
8.12  Compliance with Laws. ................................................................................................ 21
8.13  Web Site and Internet Marketing. ................................................................................ 21
8.14  Intranet. ....................................................................................................................... 21
8.15  Franchise Advisory Council. ........................................................................................ 22
IX.   PROPRIETARY MARKS ............................................................................................... 22
9.1   License of the Marks. ................................................................................................... 22
9.2   Your Business Name. ................................................................................................... 23
9.3   Trade Secrets and Proprietary Information. ................................................................. 24
9.4   Modification of Marks and Trade Dress. ...................................................................... 24
9.5   Mark Infringement Claims and Defense of Marks. ....................................................... 25
X.    MARKETING AND PROMOTION .................................................................................. 25
10.1  Use of Marketing and Promotion Fund Contribution. ................................................... 25

| 10.2 | Advertising Content and Costs. | 26 |
|---|---|---|
| **XI.** | **NON-COMPETITION COVENANTS** | **26** |
| 11.1 | Exclusive In-Term Dealing. | 26 |
| 11.2 | Post Termination Non-Competition Covenants. | 26 |
| 11.3 | General Provisions regarding Non-Competition Covenants. | 27 |
| **XII.** | **ASSIGNMENT** | **28** |
| 12.1 | Assignment by Us. | 28 |
| 12.2 | Assignment by You. | 28 |
| 12.3 | Right of First Refusal. | 29 |
| 12.4 | Transfers to Certain Family Members. | 30 |
| 12.5 | Transfers to Affiliated Entities. | 30 |
| 12.6 | Transfers upon the Death or Incapacity of an Individual Franchisee or Majority Equity Owner. | 30 |
| 12.7 | Consent to Transfers. | 31 |
| **XIII.** | **DEFAULT AND TERMINATION** | **31** |
| 13.1 | General. | 31 |
| 13.2 | Immediate Termination. | 31 |
| 13.3 | Termination After Notice. | 32 |
| 13.4 | Description of Default. | 32 |
| 13.5 | Statutory Limitations. | 33 |
| 13.6 | Extended Cure Period. | 33 |
| 13.7 | Our Right to Cure Your Defaults. | 33 |
| 13.8 | Waiver and Delay. | 33 |
| 13.9 | Recovery of Lost Royalty; Liquidated Damages. | 33 |
| 13.10 | Collection Costs. | 33 |
| 13.11 | Continuance of Business Relations. | 33 |
| **XIV.** | **DISPUTE RESOLUTION** | **33** |
| 14.1 | Initial Steps to Resolve a Dispute; Mediation. | 33 |
| 14.2 | Arbitration. | 34 |
| 14.3 | Injunctive Relief. | 35 |
| 14.4 | Legal Fees and Expenses. | 35 |
| 14.5 | Survival. | 36 |
| **XV.** | **OBLIGATIONS AND RIGHTS UPON TERMINATION OR EXPIRATION.** | **36** |
| 15.1 | Your Obligations. | 36 |
| 15.2 | Our Rights as Franchisor. | 37 |
| **XVI.** | **GENERAL TERMS AND PROVISIONS** | **37** |
| 16.1 | Notices. | 38 |
| 16.2 | Indemnity. | 38 |
| 16.3 | Your Relationship to Us as Franchisee. | 39 |
| 16.4 | No Third-Party Beneficiaries. | 39 |
| 16.5 | Survival of Covenants. | 39 |
| 16.6 | Successors and Assigns. | 39 |
| 16.7 | Joint and Several Liabilities. | 40 |
| 16.8 | Titles for Convenience Only. | 40 |
| 16.9 | Gender. | 40 |
| 16.10 | Severability; Partial Invalidity. | 40 |
| 16.11 | Counterparts. | 40 |
| 16.12 | Compliance with U.S. Anti-Terrorism and Other U.S. Federal Laws. | 40 |
| 16.13 | Governing Law. | 41 |
| 16.14 | Entire Agreement. | 41 |
| **XVII.** | **EFFECTIVENESS OF AGREEMENT** | **41** |
| **XVIII.** | **ACKNOWLEDGMENTS AND REPRESENTATIONS** | **41** |
| 18.1 | Acknowledgments and Representations. | 41 |
| 18.2 | Additional Information Respecting You and Your Principal Equity Owners. | 42 |

FBBC FA 08 2019

# FRANCHISE AGREEMENT

This Franchise Agreement ("Agreement") is made and entered into as of _____March 11_____, 20 20 (the "Effective Date"), by and among Fit Body Boot Camp, Inc., a California corporation ("we" or "us"), and _____Justin Smith_____ with an address at _____16520 Green Valley Truck TRL, Ramona, CA 92065_____ ("you"), and (if you are not a sole proprietorship) each person owning an interest your entity, who will sign and be a party to this Agreement (in such context, "Principal Equity Owner"), with reference to the following facts:

## RECITALS

An entity affiliated with us (the "Owner of the Marks") owns the Fit Body Boot Camp trademarks, service marks and other intellectual property and all rights in respect thereof. The Owner of the Marks has authorized us to license them to Fit Body Boot Camp franchisees.

You desire to be franchised and licensed by us to use our "System" (as defined in Article I below), "Marks" (as defined in Article I below) and goodwill to conduct the "Franchised Business" (as defined in Article I below) from a specific "Outlet" (as defined in Article I below and identified in Exhibit 1 attached).

We are willing to grant you a "Franchise" (as defined in section 3.1 hereof), in accordance with the provisions of this Agreement and the Brand Standards Manual.

## I.    DEFINITIONS

**Abandoned**. The term "Abandoned" means cessation of operation of the Franchised Business without our prior written consent for a period of five consecutive business days, or for any shorter period of time where you also communicate to us or to your landlord for the Franchised Business premises your intention not to re-open the Franchised Business. A repeated pattern of inactivity at your Outlet for periods of less than five consecutive business days may also result in your Franchised Business being deemed Abandoned if in our judgment such inactivity adversely impacts the Franchised Business. However, your Franchised Business will not be deemed Abandoned if the inactivity is due to natural disasters or other matters reasonably beyond your control, provided that you give us notice of any such closure within five business days after the initial occurrence of the event resulting in such inactivity, and we acknowledge in writing that such inactivity is due to one of the foregoing causes, and provided further that you re-establish the Franchised Business and be fully operational within 180 days after the initial occurrence of the event resulting in such inactivity or such longer period as we may permit.

**Anniversary Year**. The term "Anniversary Year" means the 12-month period between the "Opening Date" (as defined below in this Article I) and the first anniversary thereof and between each succeeding anniversary.

**Brand Standards Manual or "Confidential Operations Manual"**. The term "Brand Standards Manual" means the confidential operations manual or manuals (regardless of title) containing policies and procedures to be adhered to by you in performing under this Agreement, including all amendments and supplements thereto provided to you from time to time.

**Confidential Information.** The term **"**Confidential Information" means information, know-how, and materials, other than Trade Secrets, that is of value to us (or other third party, as applicable) and treated as confidential by any of the foregoing and is disclosed or made known or available to you or your employees or agents. Without limiting the generality of the foregoing, the term "Confidential Information" includes, without limitation: (i) the Confidential Operations Manual; (ii) all technical and non-technical information, including without limitation, information concerning finances, financing and capital raising plans, accounting or marketing, business opportunities, affiliate lists, business plans, forecasts, predictions, projections, recipes, products, research, development, and know-how; (iii) Intellectual Property, the Marks, Fit Body Boot Camp Services and Products, insignias, designs, and materials subject to copyright, patent, or trademark registration; (iv) any developments, inventions, improvements, additions, modifications, enhancements, derivatives, ideas, reports, analyses, opinions, studies, data or other materials or work product, whether prepared by us or otherwise, that contain or are based upon Proprietary Information; (v) information regarding customers and potential customers of the Franchised Business, including customer lists, names, needs or desires with respect to the products or services offered, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Franchised Business and other non-public information relating to customers and potential customers; (vi)

- 3 -

DocuSign Envelope ID: 946F4E01-C141-422A-A000-E42E0EACB808

information regarding any of Franchisor's business partners or affiliates and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the discloser, and other non-public information relating to business partners; (vii) information regarding personnel, including compensation and personnel files; and (viii) any other non-public information that a competitor of ours could use to our competitive disadvantage.

**Control**. The term "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Consumer Price Index or CPI**. The term "Consumer Price Index" or "CPI" means the annual average of the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics of the United States Department of Labor (or the highest similar future index if these figures become unavailable).

**Fit Body Boot Camp Services and Products.** The term "Fit Body Boot Camp Services and Products" means (i) a variety of fitness products and accessories supplied by us, designated vendors and/or approved suppliers for use and resale by you at your Outlet and (ii) other goods and services that we specifically authorize you to offer and sell at your Outlet, in accordance with this Agreement and the Brand Standards Manual (as amended from time to time by us in our discretion).

**Fitness Trainer**. The term "Fitness Trainer" means an individual that has been designated by you as a provider of Fit Body Boot Camp training techniques to retail customers and who has successfully completed the portion of the initial training program we designate (as set forth more fully in section 6.1 hereof) or otherwise been certified by us as a qualified fitness trainer.

**Force Majeure**. The term "Force Majeure" means natural disasters (such as tornadoes, earthquakes, hurricanes, floods, fires or other natural catastrophes); strikes, lockouts or other industrial disturbances; war, terrorist acts, riot, or other civil disturbance; epidemics; or other similar forces which you could not by the exercise of reasonable diligence have avoided; provided however, that neither an act or failure to act by any federal, state, county, municipal and local governmental and quasi-governmental agency, commission or authority, nor the performance, non-performance or exercise of rights under any agreement with you by any lender, landlord, or other person will be a Force Majeure, except to the extent that such act, failure to act, performance, non-performance or exercise of rights results from an act that is otherwise a Force Majeure. For the avoidance of doubt, your financial inability to perform or your insolvency will not be a Force Majeure under this Agreement.

**Franchised Business**. The term "Franchised Business" means (i) the providing of Fit Body Boot Camp fitness programs and services to retail customers using designated or authorized Fit Body Boot Camp training techniques and formats (ii) the sale to retail customers of "Fit Body Boot Camp Services and Products" (as defined in this Article I), and other services we authorize in the Brand Standards Manual and (iii) the operation and marketing of an Outlet within the "Territory" (as defined in this Article I), pursuant to our "System" (as defined in this Article I) and business methods and procedures set forth by us.

**General Manager**. The term "General Manager" means the individual (may be a Principal Equity Owner) that has been designated by you as the person responsible for the day-to-day operation of the Outlet, and who has successfully completed "Initial Training" (as required pursuant to section 6.1 hereof).

**Gross Revenues**. The term "Gross Revenues" means any and all revenue derived from the sale or lease of any and all services and products, and all income of every kind and nature, related in any way to the Franchised Business, whether for cash or credit (and regardless of collection in the case of credit) and whether or not such sales are made at or by the Franchised Business, including revenue generated from the sale of memberships, goods, products, merchandise, services and advertising and not modified for uncollected amounts; except that "Gross Revenues" does not include any sales tax collected from your customers and tendered to any taxing authority.

**Initial Training**. The term "Initial Training" means training in the System provided by us, as described in section 6.1 hereof.

**Marks**. The term "Marks" means the proprietary marks that are associated with the Fit Body Boot Camp system and associated designs in respect of which registrations have been obtained from or applied for with the United States Patent and Trademark Office, as well as all common law trademarks and service marks, trade names, logos,

insignias, designs and other commercial symbols which we now or hereafter are authorized to use and use or authorize others to use to identify the Franchised Business.

**Opening Date**. The term "Opening Date" means the day you open your Outlet, furnished, inventoried and equipped in accordance with our requirements, and you begin operating the Franchised Business at your Outlet.

**Outlet**. The term "Outlet" means a retail fitness studio and equipment store that we have consented to which is exclusively dedicated to the operation of the Franchised Business under the Marks and in accordance with the System and the terms of this Agreement.

**Principal Equity Owners.**  The term "Principal Equity Owners" means all persons and entities that own a direct or indirect interest in you, if you are a legal entity.

**Proprietary Information.** The term "Proprietary Information" means, refers to, and includes our Trade Secrets and Confidential Information. No formal identification of Proprietary Information will be required. Without limiting the generality of the foregoing, Proprietary Information may take the form of documentation, drawings, specifications, software, technical or engineering data and other forms, and may be communicated orally, in writing, by electronic means or media, by visual observation and by other means.

**System**. The term "System" means comprehensive marketing and operational systems prescribed by us to be used in the conduct of the Franchised Business, as set forth in this Agreement and the Brand Standards Manual. The System includes (i) the Marks, (ii) know-how relating to Fit Body Boot Camp Services and Products, (iii) advertising, marketing and sales programs and techniques, (iv) training programs, and (vi) related materials, artwork, graphics, layouts, slogans, names, titles, text and other intellectual property that we make available to you. In our sole discretion, we may improve or change the System from time to time (including but not limited to adding to, deleting or modifying elements of the System and amending the Brand Standards Manual) for the intended purpose of making the System more effective, efficient, economical or competitive; adapting to or taking advantage of competitive conditions, opportunities, technology, materials or local marketing needs and conditions; enhancing the reputation or public acceptance of the System; or better serving the public.

**Territory**. The term "Territory" means the geographical area we designate surrounding your Outlet. The Territory, once identified, will be identified in Exhibit 1 attached hereto.

**Trade Dress**. The term "Trade Dress" means the unique and distinctive layout, design and color schemes relating to the Outlet, and the textures, sizes, designs, shapes, and placements of words, graphics, and decorations on products and packaging related to Fit Body Boot Camp Services and Products.

**Trade Secret**. The term "Trade Secret" means information constituting a trade secret within the meaning of the Uniform Trade Secrets Act, as amended from time to time.

**Transfer**. The term "Transfer" means a sale, assignment, transfer, conveyance, pledge, mortgage, encumbrance, abandonment, elimination or giving away, voluntarily or involuntarily, by operation of law or otherwise.

## II.    THE FRANCHISED BUSINESS

**2.1 Our Business.**
We are engaged in the administration, development, operation and licensing of businesses that operate Outlets offering the Franchised Business, using the Marks, operational techniques, service concepts and proprietary information owned or authorized to be used by and identified with us and our affiliated companies. Our activities in general, and our system (including proprietary products and services; logos; equipment and operations; designs and layouts for the Outlets; marketing and advertising, specialty retail items and promotional activities) are undertaken to develop, maintain and enhance the Marks and our business reputation.

**2.2 The Franchise System.**
 After our expenditure of time, skill, effort and money, we have developed and supervise the franchise System under the Marks operated in accordance with the provisions of this Agreement and our Brand Standards Manual, as amended from time to time.

## III.    GRANT OF FRANCHISE

**3.1 Grant of Franchise.**

(a) By our respective signatures below, we hereby grant to you, and you hereby accept, a license ("Franchise") to participate in and use the System by developing, owning and operating the Franchised Business at your Outlet within your Territory, in strict accordance with this Agreement and the Brand Standards Manual, from the Effective Date until the end of the term hereof and any additional term unless sooner terminated. Except as otherwise expressly set forth in this Agreement, so long as you comply with this Agreement, we will not authorize another Fit Body Boot Camp franchisee to operate, or operate ourselves, a Fit Body Boot Camp Outlet in your Territory.

(b) You acknowledge that we may have granted and may in the future operate or grant other licenses and franchises for other retail and wholesale fitness businesses outside the Territory. YOU MAY NOT USE OUR MARKS, OPERATIONAL TECHNIQUES, SERVICE CONCEPTS OR PROPRIETARY INFORMATION WITH ANY BUSINESSES OR SERVICES OTHER THAN THE FRANCHISED BUSINESS AT THE OUTLET WITHOUT THE EXPRESS PRIOR WRITTEN PERMISSION OF ONE OF OUR EXECUTIVE OFFICERS, WHICH PERMISSION, IF GRANTED, WILL BRING SUCH BUSINESSES OR SERVICES WITHIN THE SCOPE OF THE FRANCHISED BUSINESS AND SUBJECT REVENUES THEREFROM TO PAYMENT OF ROYALTY AND MARKETING AND PROMOTION FUND CONTRIBUTION REQUIREMENTS.

**3.2 Reserved Rights.**

(a) Nothing contained herein accords you any right, title or interest in or to the Marks, System, marketing and operational techniques, service concepts, proprietary information or goodwill of ours, except such rights as may be granted hereunder. **THIS AGREEMENT GRANTS YOU ONLY THE RIGHT TO OPERATE THE FRANCHISED BUSINESS AT YOUR OUTLET AND NOWHERE ELSE UNLESS WE SPECIFICALLY ALLOW YOU TO OFFER FIT BODY BOOT CAMP SERVICES AND PRODUCTS ELSEWHERE. ALL OTHER RIGHTS ARE RETAINED BY AND RESERVED TO US.**

(b) Without limiting this broad retention of rights, we reserve the right to: (i) use other channels of distribution, such as the Internet, catalog sales, telemarketing or other direct marketing sales, to make sales anywhere including within your Territory using our principal trademarks and under trademarks differ from the ones you will use under this Agreement. If we solicit or accept orders from inside your Territory through other channels of distribution, we are not obligated to pay you any compensation; and (ii) merge with, acquire, or be acquired by any business of any kind under other systems and/or other marks, which businesses may offer, sell, operate or distribute and/or license others to offer, sell, operate and distribute, goods and services through franchised or non-franchised businesses, at wholesale or retain, within and outside of the Territory. We also reserve the right to develop other systems involving similar or dissimilar services or goods, under dissimilar service marks, trademarks and trade names belonging to us, without necessarily granting you any rights in those systems. We reserve all rights to market and sell Fit Body Boot Camp Services and Products at venues other than Outlets and through other channels of distribution anywhere, including within your Territory.

**3.3 Promotion and Development of Your Outlet.**
You must (i) diligently and effectively promote, market and engage in the Franchised Business at your Outlet;
I.  develop, to the best of your ability, the potential for future Franchised Business within your Territory; and
II.  devote and focus a substantial portion of your professional attentions and efforts to such promotion and development.

**3.4 Extent of Grant.**

(a) You understand and agree that you are licensed hereby only for the operation of your Franchised Business at and from your Outlet and only within your Territory (unless we specifically agree otherwise on a case by case basis).

(b) You may not sublicense, sublease, subcontract or enter any management agreement, concession agreement, partnership agreement or joint venture agreement providing for, the right to operate the Franchised Business or to use the System granted pursuant to this Agreement.

(c) You are not permitted to offer any products or services in connection with the operation of your Franchised Business other than those we expressly approve or designate. Without limiting the foregoing, you shall not offer or sell any products or services to any System franchisee or licensee at any time during the term of this Agreement.

**3.5 Electronic Execution and Copies.**

(a) An executed counterpart of this Agreement (or any portion of this Agreement) may be delivered by any of the parties by fax, electrical, digital, magnetic, optical, electromagnetic, or similar capability regardless of the medium of transmission (any such medium is referred to in this and the following section as "electronic"), and such delivery will be effective and binding upon such party, and will not in any way diminish or affect the legal effectiveness, validity or enforceability of this Agreement.

(b) You acknowledge and agree that we may create an electronic record of any or all agreements, correspondence or other communication between us or involving third parties, and those we may thereafter dispose of or destroy the original of any such document or record. Any such electronic record may be inscribed on a tangible medium or stored in an electronic or other medium, retrievable in perceivable form, and maintained in and readable by hardware and software generally available. You agree that, notwithstanding any statute, regulation or other rule of law to the contrary, any such electronic version of this or any other agreement or correspondence between the parties will have the same legal effect, validity and enforceability as an original of any such document, even if the original of such document has been disposed of or intentionally destroyed.

**3.6 Obligations of Entity Franchisee.**

(a) If you are an entity, you must provide us at the Effective Date with a copy of your entity's organizational document and by-laws, shareholders' agreement, operating agreement or other agreement between the equity owners.

(b) If you are an entity, any person or entity that at any time after the Effective Date becomes a Principal Equity Owner of your entity will automatically acquire all the obligations of a Principal Equity Owner under this Agreement at the time such person or entity becomes a Principal Equity Owner. Before approving and entering into any transaction that would make any person or entity a Principal Equity Owner, you must notify such person about the content of this section 3.6(b). We reserve the right to, at any time, require all Principal Equity Owners to sign our designated form of personal guaranty agreement.

(c) If you are an entity, you must place the following legend on all certificates evidencing an equity interest:

"THE TRANSFER OF THE EQUITY INTEREST IN THE ENTITY REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A FRANCHISE AGREEMENT DATED ___3/11/2020_____, 20, BETWEEN THIS ENTITY AND FIT BODY BOOT CAMP, INC. REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND THE RESTRICTIVE PROVISIONS CONTAINED THEREIN AND AS MAY BE OTHERWISE SET FORTH IN THE ORGANIZATIONAL DOCUMENTS AND OPERATING AGREEMENTS OF THIS ENTITY."

## IV. PAYMENTS BY YOU

**4.1 Initial Franchise Fee.**

(a) The "Initial Franchise Fee" for a single franchised Outlet is $49,600.

(b) Veteran & First Responder Discount. If you (or if you are a legal entity, an individual who owns at least a 51% interest in the legal entity) are: (a) a member of the U.S. Armed Services; (b) a veteran of the U.S. Armed Services who was honorably discharged ("Veteran"); or (c) if you are currently serving as an emergency medical technician, firefighter, or police officer (each a "First Responder"), we will discount the Initial Franchise Fee for your initial Outlet by 25% (and you would pay $37,125).

(c) You shall pay us the Initial Franchise Fee in full, by cashier's check, money order, credit card or wire transfer to our bank account, when you sign this Agreement. If you pay by credit card, you must pay all credit card processing fees. **The Initial Franchise Fee is fully earned by us as of the Effective Date. The Initial Franchise Fee is not refundable.**

**4.2 Royalty and Other Recurring Fees and Payments.**

(a) Beginning on the 180th day after the Effective Date, you must pay us a monthly "Royalty" of $997. Notwithstanding the foregoing, if the Outlet is being acquired from an existing franchisee and/or is operational on the

Effective Date, your obligation to pay the monthly Royalty begins on the Effective Date. Royalties are due and payable monthly on the 17th day of each calendar month. Royalties will never be pro-rated, extended or deferred except if you or your Outlet experience an event of Force Majeure, or in other extenuating circumstances we determine in our sole and absolute discretion would justify such proration, extension or deferral.

(b) Software Reimbursement.  Beginning on the earlier to occur of: (a) the date on which you begin using the software, or (b) 180th day after the Effective Date, you must pay us a "Software Reimbursement" each month in the amount we designate. As of January 15, 2019, the Software Reimbursement amount is $300 per month, due and payable to us on or before the 10th day of each month. We have the right to increase this payment requirement and you are obligated to pay any such increased amount effective on your receipt of written notice.

**4.3 Marketing, Advertising and Promotion.**

(c) Beginning on the earlier to occur of: (a) the date on which you open the Outlet; or (b) the 180th day after the Effective Date, you must pay to us a monthly "Marketing and Promotion Fund Contribution" of $500.

(d) The Marketing and Promotion Fund Contribution is due and payable monthly on the first business day of each calendar month.

(e) You must conduct a "Grand Opening Marketing and Advertising Campaign" to promote the opening of your Franchised Business and you must spend in your Territory at least $5,000 and up to $8,000, as we designate, in connection with the Grand Opening Marketing and Advertising Campaign. You must prepare and submit to us in the format we designate, a written plan detailing your proposed Grand Opening Marketing and Advertising Campaign no later than 90 days before the scheduled grand opening of your Franchised Business. Within three months after the date you open the Outlet, you must send us evidence as we require to verify your compliance with the Grand Opening Marketing and Advertising Campaign and expenditures. Not later than 90 days after the Opening Date, you must provide us with a report itemizing your expenditures on the grand opening advertising and promotion of your Outlet. If you have not committed any defaults under this Agreement, we will also allocate $2,000 from the Initial Franchise Fee you paid pursuant to section 4.1 above and spend this amount in your Territory during the time period we determine, in our sole and absolute discretion, on the grand opening advertising and promotion of your Outlet.

(f) Commencing on the Opening Date, you must spend each calendar month $500 on the local marketing, advertising and promotion of your Outlet, using marketing and promotional materials pre-approved or otherwise authorized in writing by us ("Local Advertising"). Within five business days after we ask for it, you must report to us all details of your Local Advertising for the previous 30 days. If you do not comply with this obligation, we have the right to require you to pay the amount you failed to expend to us, in which case we will have the right to expend the amount directly for local marketing and advertising purposes in the area surrounding your Franchised Business. This payment is only due to us if you do not comply with your obligations to expend the amount directly, locally, and we elect to require you to pay the deficiency amount to us.

(g) On a regional or system-wide basis, we may impose an additional assessment upon affected franchisees for special designated advertising or promotional activities if two-thirds of all affected Fit Body Boot Camp franchised outlets agree to such additional assessment by affirmative vote.

(h) With respect to regional or system-wide advertising, including without limitation advertising paid from Marketing and Promotion Fund Contributions, we determine the cost, form of media, content, format, production, timing (including regional or local concentration and seasonal exposure), location and all other matters relating to advertising, public relations and promotional campaigns.

**4.4 New Client Lead Generation Programs; Reciprocal Membership.**

(a) You must participate in any "New Client Lead Generation Program" or similar program we designate, including programs set up with third parties. We will retain up to 100% of one-time upfront fees paid by the prospect for "low barrier offers" (as we designate) which are designed to drive traffic and prospects into your business. If the lead generated through any such program elects to continue as a member of your Franchised Business, you will receive all subsequent revenues generated from that client.

(b) You must fully participate with any other gift card, customer loyalty, referral and other contests and promotions we designate, require or authorize Fit Body Boot Camp franchisees to participate in. Details regarding

such contests and promotions may be set forth in the Brand Standards Manual or other written communications.

(c) You must also participate in any other Fit Body Boot Camp website promotions we designate, including those hosted and managed by us, our affiliates or our designees, on your Fit Body Boot Camp webpage.

(d) You must participate fully in any reciprocal membership access program and/or any other customer loyalty program we specify or establish in accordance with our designated policies, procedures, rules and regulations. You may not be entitled to any compensation or reimbursement for membership fees or the cost of goods or services provided to any reciprocal access member using your Outlet under the reciprocity program or applicable customer loyalty program.

(e) You must participate in any System-wide member challenge we designate and permit your members to join the challenge. We reserve the right to collect registration fees from each participating member and are not required to remit any of the revenues generated from such registration fees to you.

**4.5 Electronic Funds Transfer.**
Unless we designate otherwise in writing, all payments you are obligated to make to us under this Agreement and otherwise, including, without limitation, the monthly Royalty, Marketing and Promotion Fund Contributions, Software Reimbursement must be paid by electronic funds transfer ("EFT"). You must sign and deliver to us and our designees all of the documents, forms and information we require to authorize EFT and automatic payments to us. Unless we designate otherwise in writing, you must use the commercial billing service and its supplied computer program to process your member fees (including enrollment, monthly fees and other payments) as we designate. You must instruct and authorize the commercial billing service to credit and transfer to our bank account the Recurring Fees and all other fees you are required to pay to us under this Agreement. You must also, in addition to those terms and conditions set forth in the Brand Standards Manual, maintain a single bank account for such payments (with overdraft protection from your operating account) and must maintain such minimum balance in such account as we may reasonably specify from time to time. You must not alter or close such account except upon our prior written approval. Any failure of yours to comply with your obligations under this Section 4.5 n strict accordance with our instructions will constitute a material default of this Agreement. We reserve the right to change this payment method at any time, effective on 30 days' prior written notice to you, and we may require that you pay any and all fees due to us through any method and manner we designate. You hereby authorize the commercial billing service provider to grant us access to all of your records, including databases and receivables. We will have full access to all of your data, system and related information by means of direct access, whether in person or by telephone/modem installed and maintained at your sole cost and expense.

**4.6 Fees Fully Earned; No Setoff on Payments.**
All payments made by you to us under this Agreement are fully earned and non-refundable when paid. All payments to be made by you to us will made be without setoff, deduction, defense, counterclaim or claims in recoupment.

**4.7 Late Fee; Interest on Delinquent Payments; Administrative Fee.**

(a) Any payment, including any payment of Royalty, Software Reimbursement and/or Marketing and Promotion Fund Contribution not received by us when due will be a material breach of this Agreement and will be subject to a late charge of 5% of the amount past due. In connection therewith, you and we agree that the late charge is a reasonable and good faith estimate by you and us of such costs because (i) we will incur certain costs and expenses including, without limitation, administrative costs, collection costs, loss of interest, and other direct and indirect costs in an uncertain amount; and (ii) it would be impractical or extremely difficult to fix the exact amount of such costs in such event.

(b) All delinquent amounts will bear interest from the date payment was due at an annual percentage rate ("APR") of 18% (unless interest rates on delinquent payments in the state in which your Outlet is located are limited by law to a lesser percentage, in which case that APR will apply), and you must reimburse us immediately upon demand for all reasonable costs of collection relating to delinquent amounts.

(c) In addition to any other applicable fee due to us under this Agreement, you must pay us an Administration Fee of $500 to cover our administrative costs in connection with your request to: (a) remove an owner; (b) add an owner; or (c) relocate your Outlet. This fee is due at the time you submit your request.

**4.8 No Accord or Satisfaction.**
If you pay, or we otherwise receive, a lesser amount than the full amount provided for under this Agreement for any payment due hereunder, such payment or receipt will be applied against the earliest amount due us. We may accept

any check or payment in any amount without prejudice to our right to recover the balance of the amount due or to pursue any other right or remedy. No endorsement or statement on any check or payment or in any letter accompanying any check or payment or elsewhere will constitute or be construed as an accord or satisfaction.

## V. INITIAL TERM AND RENEWAL TERMS

**5.1 Initial Term.**
The initial term of this Agreement (applicable solely to the Franchised Business licensed hereunder) commences on the Effective Date and expires on the 7th anniversary of the Effective Date, unless sooner terminated pursuant to the provisions of this Agreement.

**5.2 Renewal Terms.**

(a) Upon written notice delivered to us not less than 120 days before the end of the existing term hereof, you may renew your Franchise for successor seven-year terms commencing on the expiration date of the previous term, subject to the provisions of sections 5.2(a) through 5.2(i) below.

(b) At the time of renewal, you must (i) then be solvent (which means that you are able to pay your debts as and when promised by you and you have assets that are greater than your debts), (ii) have not abandoned the Franchise, (iii) not be operating the Franchise in a manner endangering public health or safety or materially harming the Fit Body Boot Camp brand or reputation, and (iv) not have knowingly submitted false or incomplete reports to us during the initial term.

(c) Notwithstanding section 5.2(a) above, we are not obligated to renew your rights granted under this Agreement for an additional term if one or more of the following applies or occurs:

(i) You give us written notice of your intention not to renew this Agreement at least 180 days before the expiration of the initial term or any successor term.

(ii) During the 180 days prior to expiration of the Franchise, we permit you to sell your Franchised Business to a purchaser meeting our then current requirements for granting new Franchises or (if we are not granting a significant number of new Franchises) the then current requirements for granting renewal Franchises.

(iii) Termination of this Agreement would be permitted pursuant to sections 13.1 or 13.2 hereof.

(iv) You and we agree not to renew the Franchise.

(v) We withdraw from distributing our products or services through Franchises in the geographic market you serve, provided that:

(A) Upon expiration of the Franchise, we agree not to seek to enforce any covenant of the non-renewed franchisee not to compete with us or our franchisees; and

(B) The failure to renew is not because we are converting the business conducted by you pursuant to this Agreement to an operation by our employees or agents for our own account.

(vi) At the time of renewal, you or any Principal Equity Owner has been convicted of a felony or a crime involving moral turpitude, consumer fraud or any other offense that is reasonably likely, in our reasonable judgment, to have a materially adverse effect on the Marks, the System or the goodwill associated with the Marks or System.

(d) As a condition to renewing your Franchise rights, (i) you must sign our then-current form of Franchise Agreement (which may contain materially different terms); and (ii) you must sign a mutual general release in the form we designate releasing us from any and all claims through the effective date of the release. **IN ADDITION TO NOT GRANTING ANY ADDITIONAL RIGHTS BEYOND THOSE GRANTED IN THIS AGREEMENT, THE THEN-CURRENT RENEWAL FRANCHISE AGREEMENT MAY CONTAIN OTHER TERMS THAT ARE SUBSTANTIALLY DIFFERENT FROM THOSE IN THIS AGREEMENT.** The then-current Renewal Franchise Agreement, when executed, will supersede this Agreement.

(e) At the time of renewal, you must have satisfied all monetary obligations owed by you to us and to our

affiliates and all other material obligations under this Agreement, and we may examine your books and records to verify compliance with this requirement anytime during normal business hours within 60 days of your renewal date.

(f) At the time of renewal, you and your Principal Equity Owners may be required to execute a release, in the form prescribed by us, of all actual or potential claims you or they may have against us, our affiliates and our respective officers, directors, agents and employees as of the effective date of the Renewal Franchise Agreement.

(g) Before or not later than 90 days after your execution of a Renewal Franchise Agreement for an additional term, you must make such physical modifications to your Outlet as are reasonably necessary so that they are consistent with the then current System requirements, and so that they can accommodate new Fit Body Boot Camp Services and Products, if any. You must also bring your Outlet and equipment, materials and supplies into compliance with the standards then applicable to new Fit Body Boot Camp franchises.

(h) You must pay us a renewal fee of $5,000 at the time you sign the Renewal Franchise Agreement.

## 5.3 Month to Month Extension; Longer Notice of Expiration Required by Law.

(a) At our option, to be exercised in our sole and absolute discretion, if the renewal procedures described in section 5.2 above have not been completed, or in lieu of formal renewal of the Franchise, we may extend this Agreement on a month-to-month basis by notifying you we are doing so. Said month-to-month extension will continue until we give you at least a 30-day notice that the Franchise rights must be formally renewed in accordance with section 5.2 or the Agreement will expire and be terminated.

(b) If applicable law requires us to give a longer period of notice to you than herein provided prior to the expiration of the initial term or any successor term, we will give such additional required notice. If we do not give such required additional notice, this Agreement will remain in effect on a month-to-month basis only until you have received such required additional notice.

## VI.   TRAINING AND ASSISTANCE

## 6.1 Initial Training.

(a) It is of paramount importance that you, your General Manager, your Fitness Trainers, the Principal Equity Owners, and your other key employees and representatives understand the Franchised Business and the System, that your General Manager has been trained how to operate the Franchised Business, and that your Fitness Trainers have been trained how to provide Fit Body Boot Camp fitness techniques to retail customers. Accordingly, we will provide to your General Manager, Fitness Trainers and your Principal Equity Owners an Initial Training program, in the format and including the content that we designate (the "Initial Training"). You acknowledge that the level of training required, and time devoted to each level of training, may vary depending on the position held. For instance, Fitness Trainers may not be required or permitted to attend those portions of Initial Training that are applicable to owners and General Managers.  We reserve the right to require some or all of the Initial Training to take place at our designated facility (currently in Chino Hills, California), through the Fit Body Boot Camp Membership site, content in your Brand Standards Manual, and/or through scheduled webinars with a member of the Fit Body Boot Camp Coaching Team. The program will provide an orientation to the System and instruction on how to operate the Franchised Business. As mutually agreed upon by you and us, and subject to our availability, you and/or your General Manager may also attend additional training at or near our headquarters in Chino Hills, California, or at another training center designed by us. Unless there are extenuating circumstances that in our reasonable determination justify a delay, your required trainees (your "Training Team") must attend the next Initial Training that we offer in the calendar quarter immediately following the Effective Date. Your Training Team must complete Initial Training to our satisfaction and you may not open and operate your Franchised Business until your Training Team has satisfactorily completed Initial Training. You acknowledge and agree that we will solely determine whether the individual members of your Training Team have satisfactorily completed Initial Training. As part of your Initial Training, unless we designate otherwise in writing to you, you must: attend one Fit Body Boot Camp mastermind class within four months from the Effective Date; (b) attend a five-day Fit Body Boot Camp University training program within six months of the Effective Date.

(b) The failure of your Training Team to complete Initial Training to our satisfaction (this is typically completed within the calendar quarter immediately following the Effective Date) will be grounds for termination of this Agreement; provided, however, that your General Manager and Fitness Trainer who fails to successfully complete

- 11 -

Initial Training will have the opportunity to either retake the Initial Training or you may designate one replacement for the Initial Training program.

(c) Within the first 12 months after you open your Franchised Business, you (if you are a sole proprietor) or at least one Principal Equity Owner (if you are an entity) must complete in person courses in (i) business and operations overview and any other course we designate, which may be provided at the Fit Body Boot Camp University. These courses will be offered during the time frames we designate and may be offered only once per quarter or as we specify. All Fitness Trainers must also obtain and maintain in good standing fitness certifications provided through Fit Body Boot Camp University and on-line at *www.fbbcuniversity.com.* Details and costs of Fit Body Boot Camp University courses and fitness certifications are contained in the Brand Standards Manual.

(d) We will determine the contents and manner of conducting the Initial Training program in our discretion (currently through the Fit Body Boot Camp Membership Site, Brand Standards Manual, and webinars with members of the Fit Body Boot Camp Coaching Team), however, the training course will be structured to provide practical training in the implementation and operation of the Franchised Business and may include such topics as Fit Body Boot Camp standards, marketing and customer service techniques, reports and equipment maintenance.

(e) There is no separate fee payable to us for the Initial Training program provided to your Training Team.

(f) All costs and expenses (including travel, hotel and meal) of your Training Team and any other of your attendees of Initial Training will be your sole responsibility. All persons attending Initial Training on your behalf must have a demonstrable relationship to the management and operation of your Franchised Business.

**6.2 Training and Assistance after Opening.**

(a) After you open your Franchised Business, (i) we or our designee will provide you with access to, list your Outlet on, and integrate other information, as we designate, about your Outlet into, the Fit Body Boot Camp website, which may include access to a password protected, digital copy of the Brand Standards Manual (any future updates or modifications to your presence on the Fit Body Boot Camp website may be at your cost and expense) and (ii) you shall, on an ongoing and regular basis throughout the term, continue to access the Fit Body Boot Camp Membership website or such other platform as we designate, for workout and marketing content, and continue to schedule coaching calls or webinars.

(b) After you open your Franchised Business, at your request and subject to our availability, we will be reasonably available by phone or email for guidance to provide you with advisory assistance in the operation of your Outlet. We do not, and are not required to, provide you with any assistance related to your employment matters, including, hiring, supervising or discharging employees. We do not exercise any direct or indirect control over your employment practices. You hereby acknowledge and agree that it is entirely your responsibility to handle employment matters and that you are strongly advised to consult with an employment attorney to assist you on appropriate, responsible and legally compliant employment practices. Our representatives may visit your Outlet and Territory from time to time, but the frequency and duration of any such visits by our representatives is in our sole discretion.

(c) After you open your Franchised Business, and upon reasonable notice, we may require attendance of your designated personnel at training courses, seminars, conferences or other programs other than Initial Training or mandatory meetings (described in section 6.3 below) that are deemed by us to be relevant or appropriate to the operation of your Franchised Business. You specifically agree that only persons trained by us or under our supervision will have overall responsibility for the operation of the Outlet and Franchised Business, and that you will send your General Manager to us for additional training if we request this. You acknowledge and agree that the nature, frequency and duration of any additional training or assistance by us or our designated representatives will be in our sole discretion. We may, at our discretion, charge you an additional training fee of up to $750 per day for Fit Body Boot Camp training courses, seminars, conferences or other programs that we require you and/or your representatives to attend. We may also charge you and each person you are permitted to bring to our annual conference our then-current registration fee.

(d) We may but are not required to offer you optional staff training courses, coaching and business mentoring programs, seminars, conferences, or other programs in a suitable location we select. We may, at our discretion charge you a separate fee of up to $750 per day for this optional training.

(e) In addition to updates to the Brand Standards Manual, we may provide you with additional materials relating to the Franchised Business. We may also from time to time make available to you for purchase other

- 12 -

materials relevant to the System and the Franchised Business.

(f) All costs and expenses (including travel, hotel and meal) of your attendees at any post-opening training, conferences or meetings will be your sole responsibility. All persons attending post-opening training, conferences or meetings on your behalf must have a demonstrable relationship to the management and operation of your Franchised Business and must execute a confidentiality and nondisclosure agreement in the form we designate or approve before attending any training, conference or meeting at which Confidential Information will be disclosed.

(g) In the event of a Transfer of your Franchised Business (which must be done in full compliance with section 12.2 of this Agreement), the transferee must satisfactorily complete the training program we designate as a condition of our consent to such Transfer. The transferred Franchised Business may not be opened or re-opened by the transferee until we accept the  transferee in writing as being qualified to operate the Franchised Business and we have otherwise consented to the Transfer in accordance with this Agreement.

**6.3 Mandatory Meetings.**
Not more often than once each year, we may conduct a system-wide meeting or series of regional meetings to discuss Fit Body Boot Camp business activities or other matters relating to the Franchised Business. Attendance of the General Manager at these meetings will be mandatory (and is highly recommended for all your Principal Equity Owners). We may limit the number of your attendees at these meetings. You must pay the cost of travel, hotel and meal expenses for your attendees at these mandatory meetings. The mandatory meetings referenced in this section 6.3 are in addition to any voluntary convention or sales conference that may be coordinated by us. We reserve the right to charge a registration fee for your attendance at the annual meeting or convention, which will not exceed $500 per person.

**6.3 Proprietary Materials.**
At Initial Training and other training programs and conferences, we may provide you with Proprietary Information, as well as training materials, training curricula and related materials for your use in the training of your staff. All these items are and will remain our sole and exclusive property. You must not yourself nor allow your employees or others, to copy, reproduce, disseminate or otherwise reveal to third parties any Proprietary Information or related materials without our express prior written consent.

## VII. OPENING OF OUTLET AND FRANCHISED BUSINESS

**7.1 Approved Location; Your Outlet.**

(a)     If you have not secured an approved location for the Outlet as of the Effective Date, you shall, at your sole cost and expense, (i) find a location within the Designated Area identified on Exhibit 1 for the Outlet, which location shall be subject to our prior approval, which may be granted or withheld in our sole and absolute discretion, (ii) enter into a binding lease agreement for the location within 90 days of the Effective Date, in accordance with the terms and conditions of this Agreement, and (iii) begin constructing and equipping the Outlet in strict accordance with our then-current standards, procedures, plans and specifications. If you do not secure an approved location for the Outlet within the 90 days after the Effective Date, we have the right to immediately terminate this Agreement. We will communicate our approval or disapproval of the proposed site within 15 business days of the date you submit all information we require regarding the proposed location. We will assist you in the site selection process and we reserve the sole right of final review and consent to any location of the Outlet. We may use available demographic information to help you evaluate the site and the area in which it is located, and analyze area income figures, traffic patterns, visibility, population density, competition, zoning, parking, accessibility and other related, relevant circumstances. Our final review and consent to the location of your Outlet is not a guarantee that a Fit Body Boot Camp business can be successfully operated there or anywhere else.

(b)     You must provide a copy of the proposed lease agreement for the Outlet location before you sign any letter of intent or binding agreement. You are not permitted to sign a lease agreement for the Outlet unless and until we approve the lease agreement. You agree that we do not guarantee that the terms, including rent, will represent the most favorable terms available in the market. We require the inclusion of the terms set forth in the Lease Rider attached to this Agreement as Exhibit 4. You shall ensure that the terms of the Lease Rider are incorporated in the lease. You shall provide us with a copy of your fully executed lease agreement immediately after signing.

(c)     You acknowledge that the location, selection, procurement and development of the site for the Outlet are your responsibilities. You further acknowledge that our approval of a site and/or rendering of assistance in the selection of any site does not constitute a representation, promise, warranty or guarantee, express or

implied, by us or our officers, employees, directors, attorneys or agents, as to the potential sales volume, profits or success of the Franchised Business to be developed, opened and operated by you at the location. We will not have any liability to you with respect to any assistance we or our designees provided to you in making your selection, and in our recommendation or approval of any location. Once the location for the Outlet is secured in accordance with the terms of this Agreement, we will issue an amended Exhibit 1 to identify the approved location as the Outlet from which you will operate the Franchised Business and the Territory.

(d)      To promote the orderly and timely service of Fit Body Boot Camp customers, you may not deliver Fit Body Boot Camp Services and Products outside your Territory without our prior written consent.

**7.2 Building Out Your Outlet.**

(a) You must build out your Outlet (and commence operation of the Franchised Business there) within 180 days after the Effective Date, using architects, project managers, contractors, subcontractors, architectural plans and key equipment suppliers designated by us (or one of our affiliated companies) or otherwise reasonably acceptable to us. You must commence operation of the Franchised Business at your Outlet as soon as practicable after your receipt of a certificate of occupancy (or equivalent document) from the responsible local government authority. If  you have not commenced operation of the Franchised Business within 180 days after the Effective Date, we may terminate this Agreement effective on written notice, and if we do so, you will not be entitled to receive any refund of your Initial Franchise Fee. We may give you an extension of time to open the Outlet beyond the mandatory dates specified above in this section 7.2(a) if we deem in our sole discretion that you have made a diligent effort to open but were unable to do so due to reasons beyond your reasonable control.

(b) We will provide you with a sample prototype layout for your Outlet. You acknowledge that such plans and specifications shall not contain the requirements of any federal, state, or local law, code or regulation (including, without limitation, those concerning the Americans with Disabilities Act (the "ADA") or similar rules governing public accommodations or commercial facilities for persons with disabilities), nor shall such plans contain the requirements of, or be used for, construction drawings or other documents necessary to obtain permits or authorization to build the Outlet. It is your sole and absolute responsibility to construct the Outlet in accordance with all applicable laws, including the ADA and local laws, rules and regulations governing public accommodations. Without limiting the foregoing, at your sole expense, you must employ architects, designers, engineers or others designated or approved by us to complete, adapt, modify or substitute the sample plans and specifications for the Outlet. The architect must submit a complete set of final plans and specifications to us for approval before commencing construction of the Outlet. We will review these plans and specifications promptly and either approve them as stated or provide you with our comments on the plans and specifications. And, you may not commence construction of the Outlet until we approve, in writing, the final plans, specifications and contractors to be used in constructing the Outlet. We will consult with you, to the extent we deem necessary, on the construction and equipping of the Outlet, but it is and will remain your sole responsibility to diligently construct, equip and otherwise make ready, and then open the Outlet. You are responsible, at your expense, for obtaining all zoning classifications, permits, clearances, certificates of occupancy and center clearances which may be required by governmental authorities and for complying with all covenants, conditions, easements, and restrictions of record.

(c) You must use licensed general contractors, designers, vendors and architects approved by us before performing construction work at your Outlet. We expressly disclaim any representation or warranty of the quality of any goods or services provided by architects, contractors, or any other persons or entities which we may refer to you, including, but not limited to any warranty as to merchantability or fitness for any specific purpose. We will not be responsible for delays in the construction, equipping or decoration of the Outlet or for any loss resulting from the Outlet design or construction since we have no control over the landlord or developer and numerous construction or related problems which could occur, and consequent delay in the opening of your Outlet. We must approve in writing all changes in the Outlet plans prior to construction of the Outlet or the implementation of such changes.

(d) We must have access to your Outlet while work is in progress. We may make video records of construction in process and may require such reasonable alterations or modifications in the construction of the Outlet as we deem necessary to bring your Outlet into compliance with then-current brand standards. Your failure to promptly commence the design, construction, inventorying, equipping and opening of the Outlet with due diligence will be grounds for the termination of this Agreement. And if you do not complete the build out of the Outlet in a reasonable time, we have the right, but not the obligation, to complete the build out, all expenses of which will then be paid or reimbursed by you. Before opening of the Outlet and prior to final inspections by any governmental agency, we will complete a final "walk through" inspection of the Outlet and issue a written consent to open. Any deficiencies noted by us during this inspection must be corrected by you within 30 days or this Agreement may be

terminated without any liability to us.

(e)   We have the right to regularly inspect your Outlet and any other site where you conduct the Franchised Business.

**7.3 Equipment, Furnishings, Fixtures, Signs, Decor and Initial Inventory.**

(a) You shall install and use in and about the Outlet only such equipment, fixtures, furnishings, interior and exterior signage and other property and items which strictly conform to the appearance, uniform standards, specifications and procedures of Fit Body Boot Camp and the System, as we may revise from time to time in our sole and absolute discretion. Within the timeframes that we specify before the Opening Date, you must order from (and if necessary pre-pay to) designated or approved suppliers the recommended number of pieces of equipment, proprietary items, other items and accessories as specified in the "Outlet Development Materials" section of the Brand Standards Manual, with delivery scheduled for not later than two business days before the Opening Date. Thereafter, you must buy replacement or additional designated fitness equipment and accessories, and other authorized items only from vendors designated by us or suppliers approved by us. We and/or our affiliates have the right to retain any and all rebates, incentives and consideration offered or provided by such vendors and suppliers. We and our affiliates reserve the right to be one of, or the sole, supplier of any item and may derive revenue, benefits and other material consideration from such purchases.

(b) You must also purchase non-proprietary fixtures, furnishings, equipment, POS System, computer hardware, software, modems and peripheral equipment as we designate, including as specified in the store development materials and the Brand Standards Manual, in adequate quantities and sufficiently in advance to allow you to fully operate your Outlet on the Opening Date and on an ongoing basis.

(c) You must buy interior and exterior signs, other materials containing the Marks, and apparel containing the Marks only from suppliers approved by us.

(d) You must also purchase uniforms, supplies, paper goods, services, packaging, forms and other products and supplies to constitute your complete initial inventory of such items as specified in the Outlet Development Materials section of the Brand Standards Manual, with delivery scheduled for not later than three business days before the Opening Date.

**7.4 Marketing and Advertising Boundaries.**

(a)   You may not directly promote, advertise or otherwise market your Outlet outside the boundaries of the Territory or other advertising boundary that we designate, without our prior written consent. We may condition our approval on, among other things, your agreement to offer other Fit Body Boot Camp franchisees who are operating franchised locations in the area encompassed by the circulation base of the proposed advertising the opportunity to participate in, and share the expense of your solicitation and/or advertising. The marketing and advertising boundaries are determined by us and may be changed by us or overlap with the territories of other Fit Body Boot Camp Outlets as market conditions or type of media warrant, all in our sole discretion. Such marketing and advertising boundaries may exceed the Territory provided herein, in our sole discretion.

**VIII. OPERATION OF FRANCHISED BUSINESS**

**8.1 Operational Requirements.**

(a) At all times you must be, or employ, a General Manager who will devote his or her entire time during normal business hours, as defined in the Brand Standards Manual, to the management, operation and development of the Franchised Business. The General Manager must ensure that you fulfill your obligations to your customers in a timely and professional manner and he or she may not engage in any other business requiring his or her active participation during normal business hours. If you are, or at any time during the term of the Franchise Agreement, you become, a legal entity, one of your equity owners must be designated as the "Responsible Owner", which individual shall be listed on Exhibit 2 to this Agreement. The Responsible Owner must have the authority to accept all notices from us and must be granted the authority to legally bind the legal entity with respect to all contracts, agreements and commercial documents related to your franchised business. This person must have attended and successfully completed our initial training program.

(b) You must construct, open, maintain and operate the Franchised Business for the entire Term in strict accordance with this Agreement, the requirements and procedures set forth in the Brand Standards Manual, and any other specification provided to you by us in writing. You may only provide Fit Body Boot Camp Services and Products

- 15 -

to customers who in your reasonable judgment can use them. You may not engage in the sale or delivery of Fit Body Boot Camp Services and Products outside of your Outlet location except as we may authorize in the Brand Standards Manual or otherwise in writing. You must use the standard signs and formats that we prescribe in operating the Outlet and conducting the Franchised Business.

(c) To protect and maintain the integrity, reputation and goodwill of the System and the Marks, we require that you comply with the methodology we prescribe in providing Fit Body Boot Camp Services and Products to customers. To enhance uniformity in the delivery of goods and services to retail customers by our franchises and the strength of our Marks in inter-brand competition, and subject to applicable antitrust laws, we may recommend prices for Fit Body Boot Camp Services and Products and other products and services we authorize for sale at your Outlet. If we do so, you may not advertise or promote (whether by telephone, printed materials or any other media, including, without limitation, social media) retail prices that are inconsistent with these recommended prices. Also, to the extent permitted by federal and state law applicable to the Outlet, we may designate maximum and minimum retail prices to be charged for Fit Body Boot Camp Services and Products.

(d) Your Franchised Business must be open on a full-time basis in accordance with the hours of operation as designated in the Brand Standards Manual. The obligation to remain open will not apply in the event of natural or man-made disasters or public emergencies. You shall use the approved Outlet location solely for the operation of the Franchised Business and no portion of the premises may be assigned, subleased or otherwise transferred except as part of a sale of the Franchised Business in accordance with the conditions of transfer set forth in this Agreement.

(e) You must promptly satisfy as and when due any *bona fide* indebtedness that you incur in operating your Franchised Business.

(f) You must notify us in writing within 10 days after you receive actual notice of the commencement of any investigation, action, suit, or other proceeding, or the issuance of any order, writ, injunction, award, or other decree of any court, agency, or other governmental authority that pertains to your owners or the Franchised Business or that may adversely affect your operations in the Territory or your ability to meet your obligations hereunder.

(g) Upon the occurrence of any event, including any event that occurs at the Outlet or in the Territory, that has caused or may cause harm or injury to customers or employees, or that may damage the System, Marks, or image or reputation of the Franchised Business or us or our affiliates, you must immediately inform our designated contact person as instructed in the Brand Standards Manual by telephone, e-mail, text or other electronic messaging medium authorized by us for this purpose. You must cooperate fully with us with respect to our response to an incident described in this section 8.1(g).

(h) If there is any *bona fide* dispute as to any liability for taxes assessed or other indebtedness, you may contest the validity of the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law. However, you may not permit a tax sale or seizure by levy or similar writ or warrant, or attachment by a creditor to occur against the premises of the Franchised Business or any of its improvements.

(i) You may not engage in any co-branding in the Outlet or relating to the Franchised Business except with our prior written consent. We are not required to approve any co-branding chain or arrangement except in our discretion, and only if we recognize that co-branding chain as an approved co-brand for operation within the System. "Co-branding" includes the operation of an independent business, product line or operating system owned or licensed by another entity (not us) that is featured or incorporated within your Outlet or the Franchised Business you operate in your Territory or is adjacent to your Outlet and operated in a manner which is likely to cause the public to perceive it to be related to the Outlet and Franchised Business licensed and franchised hereunder.

**8.2 Brand Standards Manual.**

(a) You must operate the Franchised Business in accordance with the Brand Standards Manual, a copy of which will be provided to you in the manner we designate, which may be in electronic format. We have the right to modify the Brand Standards Manual at any time by the addition, deletion or other modification of the provisions thereof. All such additions, deletions or modifications are effective on the next business day after the earlier to occur of (a) the day on which the addition, deletion and / or modification is communicated to you, or (b) the day on which the digital copy maintained on our website is changed.

(b) As modified by us from time to time, the Brand Standards Manual will be deemed to be an integral part of this Agreement and references to the Brand Standards Manual made in this Agreement, or in any amendments or

- 16 -

exhibits hereto, are deemed to mean the Brand Standards Manual. However, the Brand Standards Manual, as modified or amended by us from time to time, will not alter your fundamental rights under this Agreement. If there is any discrepancy or dispute about the version of the Brand Standards Manual that you may have printed and maintain, the master copy of the Brand Standards Manual that we maintain at our headquarters and available on our website or through such other electronic means we designate, will be the controlling version and will supersede all prior versions.

(c) Upon the expiration or termination of this Agreement for any reason whatsoever, you must immediately return to us any and all copies of the Brand Standards Manual, including, without limitation, printed portions of the Brand Standards Manual then in your possession. Except as specifically permitted by us, at no time may you, or your employees or agents, (i) make, or cause to be made, any copies or reproductions of all or any portion of the Brand Standards Manual, (ii) give online access to the Brand Standards Manual to any person that has not signed a confidentiality and non-disclosure agreement in the form we designate or approve or otherwise to any unauthorized persons, or (iii) disclose any part of the Brand Standards Manual to any other person except your authorized employees and agents when required in the operation of the Franchised Business. Unless we designate otherwise, you must also permanently erase anything relating to our trade secrets or other proprietary information from any computers and other media storage devices you retain after expiration, cancellation or termination of this Agreement.

**8.3 Standards of Operation; Designated and Approved Suppliers.**

(a) You agree that we, you and everyone else involved in the System benefits from the maintenance of the highest standards of uniformity, quality, similar appearance and prominent display of the Marks at your Outlet and elsewhere in your Territory. Therefore, you agree to maintain the uniform standards of quality, appearance and display of the Marks in strict accordance with this Agreement, the architectural plans and the Brand Standards Manual as it may be revised from time to time, and as we may otherwise direct in writing. In order that we may establish and maintain an effective network of franchisees, you specifically agree that you must not display the Marks except in the manner we authorize.

(b) You acknowledge that you are only permitted to offer and sell Fit Body Services and Products, and such other services and products that we designate or approve in writing, in connection with the operation of your Outlet. We have the right to require you to purchase some or all of the Fit Body Services and Products from us, our affiliates, or other suppliers or distributors approved or designated by us. You acknowledge that, without limiting these broad rights, we may require you to sell only the supplement products we specify, and we may require you to purchase the supplement products from our designated vendor (which may be us or our affiliate) at any time in the future. We may designate single or multiple suppliers for any given item or service and may concentrate purchases with one or more suppliers. If you wish to purchase any product, service, good, equipment, or supplies from a supplier or distributor that is not on our approved list, you may submit a written request for our approval of the supplier or distributor (except in instances where we have designated a sole supplier of any product, item, good, equipment, service or supplies), which we may grant or deny in our sole and absolute discretion. The proposed supplier's or distributor's product or service, as applicable, must conform to our designated standards and specifications, which may include the ability of the supplier to provide sufficient quantities of the product or services, as applicable, to the entire System. The supplier or distributor must also provide us with any information we request in order to analyze the supplier's or distributor's suitability, and the composition and conformity of the product and/or service to our standards and specifications. We will have the right to require our representative to be permitted to inspect the supplier's facility and samples from the supplier to be delivered for evaluation and testing, either to us, our affiliate, or an independent testing facility, as we designate. You must pay us an evaluation fee of $1,500 at the time you submit your request for approval. You or the proposed supplier will be responsible for all costs and expenses associated with the testing and approval process.

(c) You acknowledge that we may revoke our approval of any supplier, product or service at any time in our sole discretion. Upon your receipt of written notification of such revocation, you must cease purchasing and selling any disapproved product and/or service.

(d) You acknowledge that we and /or our affiliates have the unrestricted right to derive income, consideration, payments and other benefits on account of your purchase or lease of any products, services, supplies and/or other items from us, any supplier, including approved suppliers and/or designated suppliers. This income may be derived in any form, including as a rebate from various suppliers based on the quantity of System franchisee purchases. These amounts and consideration are subject to change without restriction. We and our

DocuSign Envelope ID: 946F4E01-C141-422A-A000-E42F0EACB808

affiliates may, without restriction, charge mark-ups on any products and/or services sold or leased to you by us and/or our affiliates and/or system suppliers.

**8.4 Point of Sale System and Computer System.**

      (a) You must purchase, use and maintain a computer system (the "Computer System") and point of sale system (the "POS System"), as we designate, to be used in the operation of the Outlet and for reporting purposes from the suppliers we designate. If applicable, the Computer System and POS System must always be connected to a dedicated broadband connection, digital subscriber line ("DSL") or other high-speed communications medium specified by us, with access to the Internet to implement software, transmit and receive data, in the manner designated by us, including through the Brand Standards Manual or otherwise by us in writing. You must obtain and maintain agreements, including software and annual maintenance agreements with the designated suppliers, which may include the manufacturer or distributor of the Computer System and/or POS System. You must record all sales at or from the Franchised Business at the time of sale, in accordance with our procedures and specifications through the POS System. You shall comply with all requirements we designate regarding the maintenance, training, storage and safeguarding of data, records, reports and other matters relative to the Computer and the POS System. The POS System must be electronically linked to and accessible us and our designees without restriction in the manner we designate. We have the unrestricted right to independently access any and all information on your Computer and POS System at any time, without first notifying you. Without limiting the foregoing, you shall, at your sole cost and expense, permit us immediate access to your POS System and Computer System in any manner we determine, including through a third-party designee. We shall have the right to use any and all information accessed on the POS System or Computer System in any manner we determine, including the right to use any and all such information in our Franchise Disclosure Documents, to share financial statements, including profit and loss statements, with third parties including system franchisees and prospective franchisees. Without limiting the generality of the foregoing, we may poll the POS System on a daily or other basis at such times and in such manner as determined by us, with or without notice, and to retrieve such transaction information including sales, sales mix, usage and other operations data as we deem appropriate. You must ensure that only adequately trained employees, can conduct transactions using the POS System. Within a reasonable time upon our request, you must apply for and maintain debit cards, credit cards or other non-cash systems existing or developed in the future to enable customers to access and purchase Fit Body Boot Camp Services and Products via such procedure, as specified or designated by us. We may require you to update, upgrade, modify or replace the Computer System and/or the POS System, including hardware and/or software, at any time without restriction upon written notice to you.

      (b) We require you to maintain an e-mail account and always connect the Computer System to a dedicated broadband connection, DSL or other high-speed communications medium specified by us, with access to the Internet to implement software, transmit and receive data, in the manner designated by us in the Brand Standards Manual or otherwise by us in writing. You must obtain all software and hardware, including digital still and video cameras, as we may specify to enable you to provide ample security against viruses, send and receive e-mail, contact and track customers, perform accounting functions, perform marketing and access and transmit digital photos and streaming video or other multimedia signals and information to and from the Outlet, and you must, from time to time, upon our request transmit digital photos and real time video and audio signals of the Outlet to us, and in the form and manner prescribed by us.

      (c) As stated above, we may designate that certain computer software must be used in the operation of the POS System and/or Computer System ("Designated Software"). You must license or sublicense such Designated Software from our designee and enter into a software license agreement on the software licensor's then-current form and pay any related license or maintenance fees. We have the right to require you to pay any and all such fees directly to us or to our designee, including mark-ups we impose in connection with such fees and payments. You must purchase, use and install any and all upgrades, enhancements or replacements to the Designated Software, as we designate and within the time periods we specify.

      (d) You may not install, and must prohibit others from installing, unauthorized software on the POS System and the Computer System. You must take all commercially reasonable measures to insure no malicious code, malware or other unauthorized code or software is installed on, or transmitted by, the POS System or the Computer System. You must from time to time communicate to us all passwords, access keys and other security devices or systems necessary to permit us or our designee to access the POS System and Computer System and obtain the data we are permitted to obtain under this Agreement, including accounting, sales, marketing, client and other information.

      (e) All information on the POS System and Computer System, including but not limited to customer data

and contact information, is our property and you consent to our using this information in any way we see fit, including to market other products and services, including those not constituting Fit Body Boot Camp Services and Products.

(f) We may disclose information relating to your operation of the Franchised Business, including, but not limited to, Gross Revenues, customer counts, and other related data, to future prospective franchisees.

**8.5 Maintenance, Upgrades and Refurbishments to the Outlet.**

(a) You shall repair and maintain the Outlet in a clean and orderly condition and in good repair in accordance with the System, the Manual, and this Agreement. We require that you maintain, and from time to time refurbish, the Outlet to conform to the then-current building design, Trade Dress, and color schemes then applicable for an Outlet. Such maintenance and refurbishment may require expenditures by you on, among other things, structural changes, installing new equipment, remodeling, redecoration and modifications to existing improvements and such modifications as may be necessary to comply with System-wide standards then in effect for Outlets or to accommodate new Fit Body Boot Camp Services and Products. In this regard, the following requirements are applicable:

(i) You must maintain all equipment used at the Outlet on an as needed basis. And you must immediately and completely resolve to our satisfaction any maintenance deficiencies we identify.

(ii) You must make all upgrades to equipment and any technology used in your Outlet that we may require.

(iii) We may periodically require you to update the Trade Dress used at your Outlet. Such updates will be contained in the Brand Standards Manual or otherwise provided to you in writing. Such updates may require you to install new color schemes, logos, signage or other visual elements.

**8.6 Relocation of Your Outlet.**

(a) If you desire to relocate your Outlet, you may do so provided that you obtain our prior written consent and you shall, not less than 90 days prior to the desired date of relocation (unless prior notice is impractical because of a required relocation in which event notice must be given as soon as possible), you make a written request for consent to relocate, describing the reasons for the relocation and providing complete written details respecting any proposed new location.

(b) Within 20 business days after receiving your request, we will either approve or disapprove in writing such closure or relocation in our reasonable discretion. In the event of disapproval of a proposed relocation, you may request an alternative proposed new location pursuant to the provisions of this section 8.6.

(c) You and the landlord for the new premises must incorporate the Lease Rider in our then-current form into your lease agreement. You acknowledge that the Lease Rider may, among other things: (i) grant us an option to assume your position as lessee under the lease for the relocated Outlet premises if you are in material default of either the lease for the relocated Outlet premises (including an obligation of the landlord to notify us if you are in such default) or this Agreement, (ii) grant us the right to assign the lease to a *bona fide* franchisee of the System after assuming the lease, and (iii) require the landlord to fully cooperate with us in completing de-identification of the relocated Outlet if this Agreement is terminated or expires without being renewed and we do not exercise our option to assume the lease for the relocated Outlet premises.

**8.7 Record Keeping and Reporting Requirements.**

(a) You agree to implement and thereafter use specific accounting software and tools as we designate, including to track, account for and report on the financial performance and other details of the Franchised Business. Not later than 10 business days after the end of each month, you must submit to us an unaudited profit and loss statement, as well as other financial or statistical reports, records, statements or information that we reasonably deem to be required or desirable as stated in the Brand Standards Manual or otherwise in writing.

(b) Within 90 days after the end of each of your fiscal years (or any permitted extension for filing same), you must submit to us a copy of the Schedule C or equivalent portion of your federal tax return relating to the Outlet and your operation of the Franchised Business. On the Effective Date (and any time thereafter that this date changes), you must notify us of your fiscal year end date.

- 19 -

(c) All financial or statistical information you provide to us must be accurate and correct in all material respects.

(d) We have the right to use any financial or statistical information that you provide us, as we deem appropriate.

(e) We or our designated agents have the right, at all reasonable times, to examine, copy and audit the books, records and applicable Schedules C (or equivalent portion) of your tax returns that relate to the Outlet and your operation of the Franchised Business.

(f) You must maintain and preserve all books, records and accounts of or relating to the Franchised Business for at least five years after the expiration or earlier termination of this Agreement

## 8.8 Signs and Display Materials.

(a) All signs, display materials and other materials containing the Marks must be in full compliance with our designated specifications, including the specifications provided in the Brand Standards Manual and must be purchased from our designated or approved suppliers.

(b) Subject to applicable governmental ordinances, regulations and statutes, you agree to post and maintain, at the Outlet, entirely at your expense, any minimum signage recommended by us.

## 8.9 Telephone Numbers.

At your sole expense, you must list the telephone number for your Outlet in accordance with procedures prescribed by the Brand Standards Manual. At the time of termination or expiration of this Agreement, for any reason, you must transfer the telephone numbers for your Outlet to us or cancel them and de-list them from any applicable telephone directory or other telephone number listing service.

## 8.10 Insurance.

(a) You must have in effect on the Opening Date and maintain during the term of this Agreement comprehensive general liability insurance, automobile insurance, and other insurance that is legally required for you to operate your business (*i.e.*, workers' compensation insurance) or that is reasonably prudent for your type of business. Policy coverage limitations and other terms relating to insurance will be set forth in the Brand Standards Manual and are subject to modification, at our discretion. Any policies of insurance that you maintain must contain a separate endorsement naming us and the Owner of the Marks (and our other affiliated companies identified by us in writing), and their respective shareholders, members, managers, directors, officers, employees, and agents as additional insureds to the full extent of coverage provided under the insurance policies. Your insurance coverage will be primary as respects us and other affiliated companies we identify in writing, and our respective shareholders, members, managers, directors, officers, employees, and agents. Any insurance or self-insurance maintained by us and other affiliated companies we identify in writing, and our respective shareholders, members, managers, directors, officers, employees, and agents will be excess of your insurance and will not contribute with it. You must provide us a copy of the policy and endorsement upon issuance and upon renewal. You hereby grant us a waiver of any right of subrogation which any insurer of yours may acquire against us resulting from payment of any loss under such insurance. This provision applies regardless of whether we received a waiver of subrogation endorsement from the insurer. Insurance is to be placed with insurers with a current A.M. Best's rating of no less than A:VII or better and authorized to do business in the state where your Outlet is located, unless otherwise approved in writing by us.

(b) You must promptly notify us of all claims against you or us under said policies of insurance and deliver to us certificates evidencing that such insurance is in full force and effect within 30 days after the Opening Date and each succeeding anniversary of the Opening Date. Such insurance certificate must contain a statement that the certificate cannot be canceled without 30 days (10 days for non-payment) prior written notice to you and to us. You must notify us in writing immediately regarding any cancellation, non-renewal or reduction in coverage or limits.

(c) Your failure (for any reason) to procure and maintain the insurance coverage required under this Agreement will be deemed a material breach of this Agreement.

**8.11 Review and Inspection.**

(a) We have the right to send representatives at reasonable intervals at any time during normal business hours, to your Outlet or other offices to review and inspect your operations, business methods, service, management and administration relating to the Franchised Business or its equivalent, to determine the quality thereof and the faithfulness of your compliance with the provisions of this Agreement and the Brand Standards Manual.

(b) You must permit our representatives to access your Outlet and any other facility from which you sell Fit Body Boot Camp Services and Products at any time during normal business hours to conduct reviews and inspections. You must cooperate with such reviews and inspections by rendering such assistance as our representatives may reasonably request and upon notice from us or our representatives, immediately begin such steps as may be necessary to correct any deficiencies noted during any such inspection. Within 10 business days after any such inspection, our representatives may re-inspect your Outlet (or other facility, if applicable) to ensure noted deficiencies have been corrected. If the deficiencies have not been corrected by the time of the initial re-inspection, our representatives may make additional re-inspections every five business days thereafter until noted deficiencies have been corrected and you must reimburse us the travel and lodging expenses of our representatives who conduct the additional re-inspection.

**8.12 Compliance with Laws.**
You must (i) operate the Franchised Business in compliance with all applicable laws, rules and regulations of all governmental authorities, (ii) comply with all applicable wage, hour and other laws and regulations of the federal, state or local governments, (iii) prepare and file all necessary tax returns and (iv) pay promptly all taxes imposed upon you or upon your business or property. You represent and warrant that you will obtain and always maintain the permits, certificates or licenses necessary to conduct the Franchised Business in the locality within which the Outlet is situated. You must immediately notify us of any litigation, arbitration, disciplinary action, criminal proceeding, or any other legal proceeding or action brought against or involving you, or any entity affiliated with you, or any agent, employee, owner, director or partner of yours, which notification must include all relevant details in respect thereof, according to the procedures set forth in the Brand Standards Manual.

**8.13 Web Site and Internet Marketing.**

(a) During the term of this Agreement, you will use the Fit Body Boot Camp website and any other Internet or social media only as specifically authorized by us in section 6.2(a) of this Agreement, the Brand Standards Manual or otherwise in writing to market the Franchised Business conducted at your Outlet. You may not (i) establish an independent website or social networking media outlet dedicated to marketing the Franchised Business, or (ii) register an Internet domain or social networking media outlet name using any of the Marks. Without limiting the foregoing, you may not establish or maintain any social media sites and/or mobile or internet based applications (or any comparable future developed technology). We have the right to establish and implement social media guidelines and policies at any time, and we have the right to discontinue, modify and supplement any social media guidelines and policies as we determine in our discretion. You must comply with any and all established social media guidelines and policies, and you are responsible for ensuring that your managers and employees comply with the guidelines and procedures.

(b) You are not permitted to use any alternative distribution methods and/or programs, including e-commerce, web sites, Internet sub-dealers, tele-sales and telemarketing, or any other non- retail method of distribution, without first obtaining our prior written approval, which approval will be in our sole and absolute discretion.

(c) You shall comply with any and all social media policies we designate or require during the term.

**8.14 Intranet.**

(a) We may, at our option, establish and maintain an "Intranet" through which Fit Body Boot Camp franchisees may communicate with each other, and through which we and you may communicate with each other and through which we may disseminate the Brand Standards Manual, updates thereto and other confidential information. We will have discretion and control over all aspects of the Intranet, including the content and functionality thereof. We will have no obligation to maintain the Intranet indefinitely, and may dismantle it at any time without liability to you.

(b) You may use the Intranet, but only if you are in strict compliance with the standards and specifications, protocols and restrictions that we may establish from time to time regarding such use. Such standards and

- 21 -

specifications, protocols and restrictions may relate to, among other things, (i) the use of abusive, slanderous or otherwise offensive language in electronic communications, (ii) communications between or among franchisees that endorse or encourage default of any Fit Body Boot Camp franchise agreement, or other agreement with us or our affiliates, (iii) confidential treatment of materials that we transmit via the Intranet, (iv) password protocols and other security precautions, including limitations on the number and types of employees that may be granted access to the Intranet, (v) grounds and procedures for our suspending or revoking a franchisee's access to the Intranet, and (vi) a privacy policy governing our access to and use of electronic communications that franchisees post to the Intranet. You acknowledge that, as administrator of the Intranet, we can technically access and view any communication that any person posts on the Intranet. You further acknowledge that the Intranet facility and all communications that are posted to it will become our property, free of any claims of privacy or privilege that you or any other person may assert.

(c) You must establish and continually maintain (during all times that the Intranet is operational and until the termination of this Agreement) an electronic connection (the specifications of which will be specified in the Brand Standards Manual) with the Intranet that allows us to send messages to and receive messages from you, subject to the standards and specifications.

**8.15 Franchise Advisory Council.**
We may, at our option, establish a franchise advisory council (the "FAC"), which will be composed of franchisees of the System. The FAC will, among other functions requested by us, serve as a representative committee for franchisees of the System and facilitate and coordinate the sharing of information and ideas between franchisees of the System and us. If appointed or elected to do so, you (or your designee) must, at your own expense, participate as a member of the FAC. We reserve the right to set reasonable standards for appointment or election to the FAC and you acknowledge that if we establish the FAC, you may be required to pay a fee or otherwise contribute to the FAC, as the FAC leadership or we may require. You acknowledge that the role of the FAC is advisory only, and we are not obligated to implement the FAC's recommendations. Neither you nor your designee will have the right to be appointed, elected, and if appointed or elected, to continue to serve on the FAC if you are in material default of this Agreement, or are not current in your financial obligations to us, and your landlord (if any), suppliers and vendors.

## IX.  PROPRIETARY MARKS

**9.1 License of the Marks.**

(a) We hereby grant you the right during the term hereof to use and display the Marks in accordance with the provisions contained in this Agreement and in the Brand Standards Manual, solely in connection with your operation of the Franchised Business in the Territory. Neither you nor any Principal Equity Owner nor any employee, agent, or representative thereof may use, display or permit the use or display of trademarks, trade names, service marks, insignias or logo types other than the Marks and other trademarks and service marks approved for use by us with the Franchised Business. Neither you nor any of your owners, nor any employee, agent, or representative thereof may use or display the Marks in the operation of any business or other activity that is outside the scope of the Franchised Business. You may only use the Marks on the Internet or other electronic media in the manner and as specifically authorized by us in the Brand Standards Manual or otherwise in writing. You agree to be responsible for and supervise all your employees and agents to insure the proper use of the Marks in compliance with this Agreement.

(b) You acknowledge that the Marks have been licensed to us by our affiliate, the Owner of the Marks (the "Owner"), to use in the franchised System. You acknowledge and agree your use of the Marks is a temporary authorized use under this Agreement and that the Owner of the Marks retains all ownership interests in the Marks and that the Owner of the Marks, we and the Owner of the Marks retain all ownership of the goodwill generated by the Marks. You acknowledge that the use of the Marks outside the scope of the terms of this Agreement without our written consent is an infringement of the Owner of the Marks' and our exclusive rights, title and interest in and to the Marks. You agree that as between you and us, all rights to use the Marks within the franchised System are our exclusive property. You now assert no claim and will hereafter assert no claim to any goodwill, reputation or ownership thereof resulting from your franchised use thereof or otherwise. It is expressly understood and agreed that ownership and title of the Trade Dress, Brand Standards Manual and our other manuals, bulletins, instruction sheets, forms, methods of operation and goodwill are and, as between you and us, remains vested solely in us, and the use thereof is only co-extensive with the term of this Agreement.

(c) You agree that during the term of the Franchise, and after the repurchase, expiration or termination of the Franchise, you will not, directly or indirectly, commit an act of infringement or contest or aid others in contesting the validity, distinctiveness, secondary meaning, ownership or enforceability of the Marks or take any other action in

derogation of the Marks, and that no monetary amount will be assigned as attributable to any goodwill associated with your use of the System or the Marks.

(d) You hereby grant us the right at any time to use the name, image and likeness of you and your owners for commercial purposes in the marketing and promotion of the Marks, Fit Body Boot Camp Services and Products, any Fit Body Boot Camp Outlet, and the System, without any form of compensation or remuneration. You also agree (i) to have any affected employee of yours who is not a Principal Equity Owner sign a release in the form contained in the Brand Standards Manual authorizing us to also use his or her name, image and likeness for the purposes described in this section 9.1(d), without compensation or remuneration, and (ii) to provide us with a copy of such signed release. The terms of this section 9.1(d) survive termination or expiration of this Agreement.

[Your Initials_____ Principal Equity Owners' Initials:_____]

(e) You acknowledge that we prescribe uniform standards respecting the nature and quality of Fit Body Boot Camp Services and Products provided by you when the Marks are used. Nothing herein gives you any right, title or interest in or to any of the Marks, except a mere privilege and license during the term hereof to display and use the same and you agree that all your use of the Marks under this Agreement inures to our benefit and the benefit of the Owner of the Marks.

(f) You and all of your owners agree that all materials associated with us, Fit Body Boot Camp Services and Products or other services, artwork, graphics, layouts, slogans, names, titles, text or similar materials incorporating, or being used in connection with, the Marks which may be created by you, your employees, agents and subcontractors and any other party with whom you may contract to have such materials produced pursuant to this Agreement will become the sole property of the Owner of the Marks, including copyright and trademark rights. In furtherance thereof, you hereby and irrevocably assign to us all such materials, artwork, graphics, layouts, slogans, names, titles, text or similar materials, whether presently or hereafter existing. Furthermore, you agree on behalf of yourself, your employees, your agents, your subcontractors and any other party with whom you may contract to have such materials produced, to promptly execute any and all appropriate documents in this regard.

(g) If necessary, you agree to join with us and share the expenses in any application to enter you as a registered or permitted user, or the like, of the Marks with any appropriate governmental agency or entity. Upon termination of this Agreement for any reason whatsoever, we may immediately apply to cancel your status as a registered or permitted user and you hereby consent to the cancellation and agree to join in any cancellation petition. You will bear the expense of any cancellation petition.

## 9.2 Your Business Name.

(a) During the term of this Agreement, you shall hold yourself out to the public as an independent contractor operating the franchised business pursuant to a license from us. You must take all action as may be necessary to do so, including, without limitation, exhibiting a notice in a conspicuous place at the Outlet premises, the content of which we reserve the right to specify, providing that you are a franchisee and independent contractor. Without limiting the foregoing, you shall display the following notice, unless we designate otherwise in writing, at a prominent place visible to customers of your Outlet with your name inserted where indicated: "This Fit Body Boot Camp business is a franchised location and is independently owned and operated by [INSERT Franchisee name]". Additionally, in connection with your operation of the Outlet, you agree that at all times and in all advertising, promotions, signs and other display materials, on your letterheads, business forms, and at the Outlet and other authorized business sites, in all of your business dealings related thereto and to the general public, you will identify the Franchised Business as an "INDEPENDENTLY OWNED AND OPERATED" franchised business on your letterhead, contract agreements, invoices, advertising and other written materials containing the Marks as we may direct. You must provide written notification to each person you intend to hire as an employee advising such person that Fit Body Boot Camp, Inc. is NOT and will under no circumstances be construed as their employer.

(b) You must file and keep current a fictitious business name statement, assumed name certificate or similar document with respect to your Business Name in the county or other designated jurisdiction in which you are conducting business and at such other places as may be required by law. Before you commence engaging in the Franchised Business under the Marks, you must supply evidence satisfactory to us that you have complied with relevant laws regarding the use of fictitious or assumed names.

(c) On expiration or sooner termination of this Agreement, we may, if you do not do so, execute in your name, and on your behalf, all documents necessary, in our judgment, to end and cause a discontinuance of the use

- 23 -

by you of the Marks and Business Name registrations and we are hereby irrevocably appointed and designated as your attorney-in-fact to do so.

(d) You further agree that you will not identify yourself as (i) us, (ii) a subsidiary, parent, division, shareholder, partner, agent or employee of ours or the Owner of the Marks or (iii) any of our other franchisees.

(e) If you are an entity and not an individual proprietor, you cannot use any of the Marks in your entity's legal name.

**9.3 Trade Secrets and Proprietary Information.**

(a) Under this Agreement, we are licensing you access to our Proprietary Information and other confidential data and information. You acknowledge that the material and information now and hereafter provided or revealed to you pursuant to this Agreement (including without limitation, the contents of the Brand Standards Manual) are our confidential trade secrets and are revealed in confidence, and you expressly agree to keep and respect the confidences so reposed, both during the term of this Agreement and thereafter. We expressly reserve all rights with respect to the Marks, Proprietary Information, methods of operation and other proprietary information, except as may be expressly granted to you hereby or in the Brand Standards Manual. We may disclose to you certain Trade Secrets as reasonably needed for the operation by you of your Franchised Business by loaning to you, for the term of this Agreement, the Brand Standards Manual and other written materials containing the Trade Secrets, through training and assistance provided to you hereunder, and by and through the performance of our other obligations under this Agreement.

(b) You acknowledge that we are the sole owner of all Proprietary Information, including our Trade Secrets; that such information is being imparted to you only because of your special status as a franchisee of the System; and that our Proprietary Information are not generally known to our industry or the public at large and are not known to you except by reason of such disclosure. You further acknowledge that you will acquire no interest in the Proprietary Information disclosed to you, other than the right to use them in the development and operation of the Franchised Business during the term of this Agreement.

(c) You agree that you will not do or permit any act or thing to be done in derogation of any of our rights in the Marks, either during the term of this Agreement or thereafter, and that you will use these only for the uses and in the manner franchised and licensed hereunder and as herein provided. Furthermore, you and your employees and agents will not engage in any act or conduct that impairs the goodwill associated with the Marks.

(d) You agree to indemnify us and hold us harmless from all "Losses" (as defined in section 16.2 of this Agreement), which we may sustain because of any unauthorized use or disclosure of Proprietary Information or Marks by you or your employees and agents. You further agree and acknowledge that the disclosure or use of Proprietary Information or Marks in a manner not authorized by this Agreement will cause immediate and irreparable damage to us that would be impossible or inadequate to measure and calculate and could not be fully remedied by monetary damages. Accordingly, we have the right to specifically enforce this Agreement and seek injunctive or other equitable relief as may be necessary or appropriate to prevent such unauthorized disclosures or use without the necessity of proving actual damages resulting from any such breach or threatened breach of this Agreement. You further agree that no bond or other form of security is required to obtain such equitable relief and you hereby consent to the issuance of such injunction and to the ordering of specific performance. You further agree and acknowledge that such remedies are in addition to any other rights or remedies, whether at law or in equity, which may be available to us, including monetary damages.

(e) 18 USC Section 1833(b) states: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Accordingly, you and we will each have the right to disclose in confidence Trade Secrets to Federal, State, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. You and we also have the right to disclose Trade Secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Nothing in this Agreement is intended to conflict with 18 U.S.C. Section 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. Section 1833(b).

**9.4 Modification of Marks and Trade Dress.**

We may add to, substitute or modify any of the Marks or Trade Dress from time to time, by directive in the Brand Standards Manual. You must accept, use, display, or cease using, as may be applicable, the Marks and Trade Dress, including but not limited to, any such modified or additional trade names, trademarks, service marks, logo types and commercial symbols, and must within 30 days of receiving notification, commence to implement such changes and use your best efforts to complete such changes as soon as practicable.

**9.5 Mark Infringement Claims and Defense of Marks**.

(a) If you receive notice or otherwise become aware of any claim, suit or demand, threatened or pending, against you by any party other than us, the Owner of the Marks or any of our affiliates on account of any alleged infringement, unfair competition or similar matter arising from your use of the Marks in accordance with the terms of this Agreement, or any misuse of the Marks by third parties on the Internet or otherwise, you must promptly notify us of any such claim, suit, demand or misuse. You will have no power, right or authority to settle or compromise any such claim, suit or demand by a third party or to intervene to stop misuse, without our prior written consent. We will defend, compromise or settle at our discretion any such claim, suit or demand and take steps to stop misuse at our cost and expense, using attorneys selected by us or the Owner of the Marks, and you agree to cooperate fully in such matters.

(b) We will indemnify you and hold you harmless from and against all judgments resulting from any claim, suit or demand arising from your authorized and proper use of the Marks in accordance with the terms of this Agreement. We have the sole discretion to determine whether a similar trademark or service mark that is being used by a third party is confusingly like the Marks being used by you or constitutes a misuse of the Marks, and whether and what subsequent action, if any, should be undertaken with respect to such similar trademark or service mark or misuse.

## X.   MARKETING AND PROMOTION

**10.1 Use of Marketing and Promotion Fund Contribution.**

(a) You must pay to us the Marketing and Promotion Fund Contribution on a monthly basis, unless we designate otherwise. Marketing and Promotion Fund Contributions collected from you and other Fit Body Boot Camp franchisees, and any earnings on any such fees collected, are used to meet the costs of producing, maintaining, administering, directing, conducting, and preparing of national, regional and local advertising, marketing, and related programs, materials and services, including, without limitation, digital and traditional media, public relations services and materials, network advertising, market research, printing costs, and promotional campaigns, and any other activities which we believe will enhance the image and goodwill of the System. We will determine, in our sole discretion, the cost, form or media, content, format, production and timing, including regional or local concentration and seasonal exposure, location and all other matters involving advertising, public relations and promotional campaigns.

(b) Marketing and Promotion Fund Contribution are deposited into a separate bank account. This account will not be subject to audit, and no interest on the amounts on deposit will be imputed for your benefit or paid to you. Administration of the Marketing and Promotion Fund Contribution may result in either a surplus or a deficit. In any given year, we may expend an amount that is greater than or less than the aggregate contributions collected during that year. We have the right to borrow from lenders, including from us or affiliated lenders. We or our designee will administer the expenditure of Marketing and Promotion Fund Contribution and we will have the sole right to determine all aspects of the programs and materials financed by the Marketing and Promotion Fund Contribution, including national, regional and/or local media, materials, concepts, sponsorships, endorsements and programs. Without limiting this broad discretion, we may engage third party or related party agencies to administer or otherwise provide services in connection with the expenditure of Marketing and Promotion Fund Contribution. While our goal is to maximize general brand recognition, awareness and goodwill associated with the Marks for the entire System, we cannot assure you that you or any particular franchisee will benefit directly or pro-rata from any expenditures of Marketing and Promotion Fund Contribution. We have no obligation to spend any amount on advertising, marketing or promotional activities in your area.

(c) We and/or our designee will have the right to receive a fee in administering Marketing and Promotion Fee expenditures of up to 15% of the annual aggregate Marketing and Promotion Fund Contribution, and we will have the right to recover our costs and expenses incurred in administering the fund expenditures. Administrative expenses may include amounts equivalent to salaries, travel and other expenses of our or our designee's employees whose services are provided in connection with the use, administration, collection and expenditure of Marketing and Promotion Fund Contribution.  We do not act as a trustee or in any other fiduciary capacity.

(d) We intend to use digital media (Internet), social media (Facebook, Instagram, Twitter, etc.), and

targeted print media in our marketing and advertising efforts, but we are not limited to these types of media. In the future, we may use local radio and television advertising, and we reserve the right to use other media to market and promote the Brand. We may be using in-house advertising personnel to do this, and we may hire advertising and public relations firms to assist us in these efforts.

(e) We may provide general advertising programs and sales promotion, campaign and sample advertising materials. You may develop advertising materials for your own use, at your own cost, however, before you use any such materials, you must provide to us, in advance of use, your proposed materials for our prior approval, which we may grant or deny in our sole discretion. You grant us a the right to use the name, image and likeness of you, all Principal Equity Owners and any of your affected employees, for commercial purposes in connection with the marketing and promotion of the Marks, Fit Body Boot Camp Services and Products, any Fit Body Boot Camp Outlet and the Fit Body Boot Camp system.

(f) If we do not expend all Marketing and Promotion Fund Contributions collected for one year, the amount remaining would be retained for future advertising, marketing and promotion. If you request in January or February an accounting of Marketing and Promotion Fund Contribution expenditures, we will provide you, on or before the following May 30th with a statement describing annual receipts and expenditures of Marketing and Promotion Fund Contributions during the preceding calendar year. This statement may be audited or unaudited, at our discretion.

(g) The Marketing and Promotion Fund Contribution will not be used primarily for the solicitation for new franchise sales, although we may generally expend funds to promote the Fit Body Boot Camp brand in such ways, methods and using the media as we may decide in our sole discretion. We reserve the right to include a notation in any and all advertising and materials created though use of Marketing and Promotion Fund Contribution that indicates franchise opportunities are available.

## 10.2 Advertising Content and Costs.

With respect to local, regional or system-wide advertising, we determine the cost, form of media, content, format, production, timing (including regional or local concentration and seasonal exposure), location and all other matters relating to advertising, public relations and promotional campaigns.

## XI.  NON-COMPETITION COVENANTS

### 11.1 Exclusive In-Term Dealing.

(a) You acknowledge that you will receive valuable specialized training and access to Proprietary Information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of the System and our Trade Secrets. In consideration for the use and license of such valuable information, you agree and covenant that, during the Term, except as otherwise approved in writing by us, neither you, nor any of your officers, directors, members, managers, shareholders, partners or owners, nor your spouse or the spouse of any of the aforementioned individuals (each a "Bound Party" and collectively, the "Bound Parties") will, directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person, persons, partnership, limited liability company or corporation: (i) operate, manage, own, assist or hold an interest in (direct or indirect as an employee, officer, director, shareholder, manager, member, partner or otherwise), or engage in, any "Competing Business".   The term "Competing Business" means any business operating or granting franchises or licenses to others to operate a fitness business or business offering or selling goods or services equivalent to Fit Body Boot Camp Services and Products or similar to the Franchised Business. The term Competing Business does not include any other Outlet operated by you or any other Bound Party, pursuant to a valid, binding franchise agreement by and between you, or the Bound Party, as applicable, and us.

(b) It is the intention of both you and us that you maximize the Franchised Business within the Territory, and any action of yours that diverts business to another entity or diminishes the Franchised Business being conducted in the Territory will be a material breach of this Agreement. Accordingly, neither you nor any Bound Party may, either directly or indirectly, for yourself or themselves, or through, on behalf of, or in conjunction with, any person, persons, partnership, corporation or other entity, (i) divert or attempt to divert any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or (ii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System.

### 11.2 Post Termination Non-Competition Covenants.

(a) For a period of one continuous, uninterrupted year commencing upon the expiration, transfer or termination of this Agreement (regardless of the cause for termination), you agree that neither you nor any Bound Party will, either directly or indirectly, for yourself or themselves, or through, on behalf of, or in conjunction with, any person, persons, partnership, corporation or other entity) operate, manage, own, assist or hold an interest in (direct or

- 26 -

indirect as an employee, officer, director, shareowner, partner or otherwise), or engage in, any Competing Business that is, or is intended to be, located: (a) at your Outlet location; (b) within 25 miles of your Outlet location; (c) within the Territory; (d) at the location of any other Fit Body Boot Camp business; or (e) within a 25 mile radius of any other Fit Body Boot Camp location (this obligation also applies to you if you assign your franchise), without our express prior written consent, which consent may be withheld in our sole and absolute discretion. Following termination or expiration of this Agreement, you must always refrain from any use, direct or indirect, of any of our Proprietary Information.

**11.3 General Provisions regarding Non-Competition Covenants.**

(a) You acknowledge that the restrictions contained in this Article XI are reasonable and necessary in order to protect our legitimate interests, and in the event of violation of any of these restrictions, we are entitled to recover damages including, without limitation, Royalties, Marketing and Promotion Fund Contribution and other fees that would have been payable if such business were included in the Franchised Business, and an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights and remedies will be cumulative and in addition to any other rights or remedies to which we are entitled at law or in equity.

(b) You agree to indemnify us and hold us harmless from all Losses (as defined in section 16.2 of this Agreement) which we may sustain because of any breach of this Article XI by you, any Principal Equity Owner, or your General Manager. You further agree that a breach of the non-competition covenants set forth above will cause immediate and irreparable damage to us that would be impossible or inadequate to measure and calculate and could not be fully remedied by monetary damages. Accordingly, we have the right to specifically enforce this Agreement and seek injunctive or other equitable relief as may be necessary or appropriate to prevent such breach or continued breach without the necessity of proving actual damages resulting from any such breach or threatened breach of this Agreement. You and each Principal Equity Owner further agree that no bond or other security will be required in obtaining such equitable relief and hereby consent to the issuance of such injunction and to the ordering of specific performance. You and each Principal Equity Owner further acknowledge that such remedies are in addition to any other rights or remedies, whether at law or in equity, which may be available to us, including, but not limited to, monetary damages.

(c) This Article XI applies to your General Manager, your owners, and each of your other managers, directors, officers, general partners and affiliates.

(d) Each provision of this Article XI is independent of each other provision of this Agreement. If any provision of this Article XI is held unreasonable or unenforceable by any court, agency or other tribunal of competent jurisdiction, you agree to be bound by the maximum duty permitted by law with respect to that provision, which will be deemed restated accordingly, and agree to be bound by all other provisions of this Article XI.

## XII. ASSIGNMENT

**12.1 Assignment by Us.**
We have the right to Transfer this Agreement, and all of our rights and privileges hereunder ("Assignment by Us") to any other person, firm or corporation ("Our Assignee").

**12.2 Assignment by You.**

(a) This Agreement is being executed in reliance upon and in consideration of the singular personal skills and qualifications of you and your owners and the trust and confidence we repose in you and them. Therefore, neither your interest in this Agreement and the Franchise granted hereunder, nor all or substantially all of the assets of the Franchised Business, nor a controlling or non-controlling interest in you (if you are a legal entity) or the Franchised Business, may be assigned, transferred, shared or divided, voluntarily or involuntarily, in whole or in part, by operation of law or otherwise, in any manner (collectively, "Assignment by You"), without our prior written consent and subject to our right of first refusal provided for in section 12.3 hereof (except that our right of first refusal will not apply to any transfer of a non-controlling interest in you if you are a legal entity). Our consent to a specific Assignment by You is not cumulative and will not apply to any subsequent assignments, in respect of each of which you must comply with this section 12.2.

(b) Prior to any Assignment by You, you must notify us of your intent to sell, transfer or assign the Franchise, all or most of the assets of the Franchised Business, or a controlling or non-controlling interest in your and/or the Franchised Business. The notice must be in writing, delivered to us in accordance with section 16.1 hereof and include the following:

(i) The name and address of the proposed assignee ("Your Assignee");

(ii) A copy of all agreements related to the sale, assignment, or transfer of the Franchise, the assets of the Franchised Business, or the interest in the Franchised Business; and

(iii) Your Assignee's application for approval to become the successor franchisee. The application must include all forms, financial disclosures and related information we designate, including those generally utilized by us when interviewing prospective new franchisees, if those forms are made available to you. If the forms are not readily available, you must request that we deliver the forms to you by business courier in accordance with section 16.1 hereof within 15 calendar days. As soon as practicable after the receipt of Your Assignee's application, we will notify you and Your Assignee, in writing, of any additional information or documentation necessary to complete the transfer application. If our then-existing standards for the approval of new or renewing franchisees are not readily available to you when you notify us of your intent to sell, transfer, or assign the Franchise, all or most of the assets of the Franchised Business, or the controlling or non-controlling interest in the Franchised Business, we will communicate the standards to you within 15 calendar days.

(c) Within 60 days after the receipt of all the necessary information and documentation required pursuant to section 12.2(b) above, or as specified by written agreement between we and you, we will notify you of the approval or disapproval of the proposed Assignment by You. The notice will be in writing and delivered to you by business courier in accordance with section 16.1 hereof. Should we elect not to exercise our right of first refusal, or should such right of first refusal be inapplicable, as herein provided, the proposed Assignment by You will be deemed approved, unless disapproved by us in writing and for reasons permitted by the law governing this Agreement. If the proposed sale, assignment or transfer is disapproved, we shall include in the notice of disapproval a statement setting forth the reasons for the disapproval. We may impose, among other things, the following conditions precedent to our consent to any such Assignment by You:

(i) Your Assignee must complete our application for a franchise, and in connection therewith, you and Your Assignee must fully disclose in writing all terms and conditions of the Assignment by You;

(ii) Your Assignee and its principal equity owners demonstrate that they have the skills, qualifications and economic resources necessary, in our sole judgment, to conduct the business contemplated by this Agreement;

(iii) Your Assignee and each of its principal equity owners expressly assume in writing for our benefit all of your obligations under this Agreement;

(iv) Your Assignee executes the then current form of Franchise Agreement being used by us for the remainder of the term of this Agreement or, in our sole discretion, for the initial term of the then current form of Franchise Agreement (unless we have a reasonable basis not to allow this, you may elect to have Your Assignee assume this Agreement for the remainder of its term);

(v) You must have complied fully as of the date of any such Assignment by You with all your material obligations to us, whether under this Agreement or any other agreement, arrangement or understanding with us;

(vi) Your Assignee agrees that our Initial Training program described in section 6.1 hereof and any other training or orientation programs then required by us will be satisfactorily completed by Your Assignee's General Manager and other necessary personnel within 30 days after the execution by Your Assignee of a Successor Franchise Agreement, provided, however, that Your Assignee must agree to pay for all of their expenses incurred in connection therewith, including any fee we charge for training (at the rate in effect at the time of transfer), travel, hotel and meal expenses;

(vii) You or the Assignee shall upgrade the Outlet to conform to our then-current standards and specifications and shall complete the upgrading and other requirements within the time period specified by us;

(viii) Not later than 10 days before the transfer, you must pay us a non-refundable "Transfer Fee" of either (A) the then-current initial franchise fee being charged by us to new franchisees if the Assignee has no existing franchise relationship with us directly or through an entity with a common majority equity ownership in an existing Fit Body Boot Camp franchisee, or (B) $7,500 if the Assignee is an existing Fit Body Boot Camp franchisee or an entity with a common majority equity ownership in an existing Fit Body Boot Camp franchisee. The Transfer Fee is subject to adjustment in our discretion based on corresponding changes in the CPI since the Effective Date. Notwithstanding the foregoing, you must pay a transfer fee of $750 if the franchise agreement is being transferred by the individuals who signed this agreement as franchisee to a legal entity wholly owned by such individual(s), or to an heir, conservator or personal representative upon the individual's death or legal disability.

(d) You do not have a right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Agreement in any manner whatsoever (except that with our consent, which will not be unreasonably withheld, you may pledge a security interest in this Agreement in connection with a Small Business Administration loan), nor subfranchise or otherwise transfer, or attempt to subfranchise or otherwise transfer the Franchised Business, or to transfer or subfranchise a portion but not all of your rights hereunder without our express prior written consent, which may be withheld for any reason in our sole discretion.

(e) Any attempt by you to assign or any purported Assignment by You in violation of this section 12.2 is void and will (i) constitute a material breach of this Agreement, (ii) cause this Agreement (and in our sole discretion any or all other agreements between you and us, or between you and our affiliates) to be subject to immediate termination without further notice, and (iii) confer no rights or interest whatsoever under this Agreement upon any other party.

(f) Upon our consent to any Assignment by You, you must bring all accounts with us current and, together with us, execute a mutual release.

(g) You, the Principal Equity Owners, the Assignee and all of its Principal Equity Owners execute our then-current form of Consent to Transfer and Release Agreement and/or Assignment and Assumption of Franchise Agreement, as we designate. A sample form of Assignment and Assumption Agreement, which may be amended in the future, is attached to this Agreement as Exhibit 3.

**12.3 Right of First Refusal.**

(a) Any party holding any interest in you (if you are a legal entity) or in the franchise granted pursuant to this Agreement and who desires to accept any bona fide offer from a third party to purchase such interest or the Franchised Business (including any sale of substantially all of the assets of the Franchised Business) shall notify us in writing of each such offer, and shall provide such information and documentation relating to the offer as we may require. Except for a transfer to your heirs, personal representatives or conservators in the case of death or legal incapacity as provided in section 12.6 hereof, any proposed transfer shall be subject to our right of first refusal, which will be exercised in accordance with the terms of this section 12.3.

- 29 -

(b) You must deliver to us a written notice setting forth (i) all the terms and conditions of any *bona fide* offer relating to a proposed Assignment by You, and (ii) all available information concerning your Assignee including a detailed summary of how the proposed assignee meets our qualifications for a new Fit Body Boot Camp franchisee, and any other related information requested by us. If the specified terms and conditions include consideration of a non-monetary nature, such consideration must be expressed in reasonably equivalent monetary terms, and if it involves matters that cannot be stated in monetary terms, such consideration will not be applicable to our right of first refusal.

(c) Within 15 days after our receipt of such notice (or if we request additional information, within 10 days after receipt of such additional information), we may either (i) consent or withhold our consent to such Assignment by You, in accordance with section 12.2 hereof, or (ii) at our option, accept the Assignment by You ourselves or on behalf of our nominee upon the terms and conditions specified in the notice.

(d) If we elect not to exercise our right of first refusal and consent to the Assignment by You, you will for a period of 60 days, and subject to the provisions of section 12.2 hereof, be free to assign this Agreement to such proposed Assignee upon the terms and conditions specified in said notice. If, however, these terms are modified in any material manner (as determined by us), or if said 60-day period expires, we will again have such right of first refusal with respect thereto and you will again be required to comply with section 12.3(b) above. Detailed terms of assignment must be delivered to us no later than 72 hours following the close of escrow or other consummation of the transaction.

**12.4 Transfers to Certain Family Members.**
You or a principal owner, if a natural person, may with our consent, which will not be unreasonably withheld, transfer the Franchised Business or an equity interest in your franchised entity to such person's spouse or person having equivalent rights under applicable federal or state law, parent, sibling, niece, nephew, descendant or spouse's descendant provided that adequate provision is made for the management of the Franchised Business and the transferor guarantees, in form and substance satisfactory to us, the performance of the transferee's obligations under this Agreement. No transfer under this section 12.4 will be subject to our right of first refusal set forth in section 12.3 hereof. However, you must comply with section 12.2(b)(i) through (vi) and (to the extent applicable) section 12.2(c) above, as well as provide full disclosure of the terms of said transfer and deliver to us no later than three business days prior to the close of the transaction. In addition, copies of fully executed paperwork must be delivered to us no less than three business days following the close of the transaction.

**12.5 Transfers to Affiliated Entities.**
You or a Principal Equity Owner may without our consent, upon 30 days prior written notice to us, Transfer the Franchised Business or an equity interest in your franchised entity to an entity that is (i) organized for the purpose of operating the Franchised Business and (ii) owned in the same proportionate amount of ownership as prior to such Transfer, provided that adequate provision is made for the management of the Franchised Business. No Transfer under this section 12.5 will be subject to our right of first refusal set forth in section 12.3 hereof or the Transfer Fee set forth in section 12.2(b)(vii) hereof. However, you must comply with section 12.2(b)(i) through (vi) above, as well as provide full disclosure of the terms of said transfer and deliver to us no later than three business days prior to the close of the transaction. In addition, copies of fully executed paperwork must be delivered to us no less than three business days following the close of the transaction. Also, you acknowledge and agree that any Transfer to an affiliate will not relieve you from your obligations under this Agreement.

**12.6 Transfers upon the Death or Incapacity of an Individual Franchisee or Majority Equity Owner.**

(a) Notwithstanding the foregoing, in the event of your death or legal incapacity, if you are an individual, or the death or legal incapacity of a Principal Equity Owner holding a majority equity interest ("Majority Equity Owner") if you are a corporation, limited liability company or partnership, the transfer of your or the deceased Majority Equity Owner's interest in this Agreement to his or her heirs, personal representatives or conservators, as applicable, will not be deemed an Assignment by You provided that a responsible management employee or agent of yours that has been satisfactorily trained by us will be responsible for the Franchised Business.

(b) In the event of your death (if you are an individual) or the death of a Majority Equity Owner, such person's interest in this Agreement or its equity interest in the franchise entity must Transfer as soon as practicable (but not more than 270 days) after the date of death in accordance with such person's will or, if such person dies without a will, in accordance with laws of intestacy governing the distribution of such person's estate, provided that adequate provision is made for the management of the Franchised Business at all times. If we determine (i) there is no

- 30 -

imminent sale to a qualified successor or (ii) there is no heir or other Principal Equity Owner capable of operating the Franchise, we may (but are not obligated to) immediately commence operating the Outlet on your behalf for a period of up to 90 days, renewable as necessary for up to one year and we will periodically discuss the status with your representatives or your heirs. For such management assistance, you or the successor in interest must pay us a reasonable *per diem* management fee/charge for serving as the interim manager.

(c) No Transfer under this section 12.6 will be subject to (i) our right of first refusal set forth in section 12.3 hereof or (ii) the Transfer Fee set forth in section 12.2(b)(vii) above, although such refusal right and Transfer Fee will be applicable to any subsequent Transfer by your (or a Majority Equity Owner's) heirs, personal representatives or conservators. However, you must comply with section 12.2(b)(i) through (vi) above, as well as provide full disclosure of the terms of said transfer and deliver to us no later than three business days prior to the close of the transaction. In addition, copies of fully executed paperwork must be delivered to us no less than three business days following the close of the transaction.

## 12.7 Consent to Transfers.

Except as otherwise provided in this Agreement and subject to our right of first refusal provided in section 12.3 hereof, you or an Principal Equity Owner may consummate any Transfer of a direct or indirect interest in this Agreement, the Franchised Business or the economic benefits derived therefrom, or any equity interest in your franchised entity, not permitted by the preceding sections 12.4, 12.5 and 12.6, only after written notice to us and only with our written consent, which will not be unreasonably withheld, and your compliance with all conditions precedent. We will exercise our good faith business judgment in determining whether to give or withhold our consent to a Transfer under this section 12.7. Such exercise of good faith business judgment may include our consideration of certain skills and qualifications of the prospective transferee which are of business concern to us, including without limitation, the following: experience in businesses similar to the Franchised Business, financial and operational skills and qualifications, economic resources, reputation and character of such prospective transferee; the ability of such prospective transferee to fully and faithfully conduct the Franchised Business as contemplated by this Agreement; and the effect that the Transfer and the prospective transferee will have or may reasonably be expected to have on the reputation or business operations of the Franchised Business, the System or us or any of our affiliates.

## XIII. DEFAULT AND TERMINATION

### 13.1 General.

(a) If you commit any act of default under this Agreement, and you fail to cure the default after any required notice and cure periods, as applicable, we shall have the right to immediately terminate this Agreement on notice to you. If any applicable law requires a longer period not notice, or longer cure period than is provided in this Agreement, then the period required by law shall be substituted for the time period provided in this Agreement.

(b) Notwithstanding anything contained herein to the contrary, in those circumstances under which we have the right to terminate this Agreement, we also have (i) the option, to be exercised in our sole discretion, to choose alternative remedies to our right to terminate the entire Agreement and (ii) the right to exercise all remedies available to us at law or in equity, including without limitation specific performance and damages (including punitive damages). All rights and remedies provided herein are in addition to and not in substitution of all other rights and remedies available to a party at law or in equity.

### 13.2 Immediate Termination.

(a) We have the right to terminate this Agreement immediately upon notice to you without an opportunity to cure:

(i) You or the business to which the Franchise relates has been the subject of an order for relief in bankruptcy, is judicially determined to be insolvent, all or a substantial part of the assets thereof are assigned to or for the benefit of any creditor, or you admit your inability to pay your debts as they come due;

(ii) You Abandon the Franchise by failing to operate the Outlet for five consecutive days during which you are required to operate the business under the terms of this Agreement, or any shorter period after which it is not unreasonable under the facts and circumstances for us to conclude that you do not intend to continue to

operate the Franchise, unless such failure to operate is due to fire, flood, earthquake or other similar causes beyond your control;

(iii) You make any material misrepresentations relating to the acquisition of the Franchise or you engage in conduct that reflects materially and unfavorably upon the operation and reputation of the Franchised Business or the System;

(iv) You fail, for a period of 10 days after notification of noncompliance, to comply with any federal, state or local law or regulation, including, but not limited to, all health, safety, building, and labor laws or regulations applicable to the operation of the Franchise;

(v) After curing any failure in accordance with section 13.3 below, you engage in the same noncompliance whether such noncompliance is corrected after notice;

(vi) You repeatedly fail to comply with one or more material requirements of this Agreement, whether corrected after notice;

(vii) The Franchised Business or the business premises of the Franchise are seized, taken over, or foreclosed by a government official in the exercise of his or her duties, or seized, taken over, or foreclosed by a creditor, lien holder or lessor, provided that a final judgment against the franchisee remains unsatisfied for 30 days (unless an appeal bond has been filed); or a levy of execution has been made upon the license granted by this Agreement or upon any property used in the Franchised Business, and it is not discharged within five days of such levy;

(viii) You are convicted of a felony or any other criminal misconduct which is relevant to the operation of the Franchise; or

(ix) We make a reasonable determination that your continued operation of the Franchise will result in an imminent danger to public health or safety.

(b) If your rights under this Agreement are terminated by us because of an event described in section 13.2(a) above, section 14.1 below is not applicable, and we may immediately commence an action under section 14.2 or 14.3 below, as applicable, to collect damages or otherwise enforce our rights.

**13.3 Termination After Notice.**

(a) Except as provided in section 13.2 hereof, we may terminate this Agreement only for good cause (as defined in section 13.1(a) above) after giving you prior written notice setting forth the asserted breach of this Agreement and giving you 30 days in which to cure the default. Upon receipt of a notice of default, you must immediately commence diligently to cure said breach, and if you cure said breach within 30 days, our right to terminate this Agreement will cease. If because of the nature of the breach, it would be unreasonable for you to be able to cure the default within 30 days, you will be given additional time (up to 15 additional days) as is reasonably necessary in our determination to cure said breach, upon condition that you must, upon receipt of such notice from us, immediately commence to cure such breach and continue to use your best efforts to do so.

(b) If your rights under this Agreement are terminated by us for material breach, we may, at our option, (i) declare you in default of all franchise agreements or other agreements you have with us, and (ii) terminate your rights under those franchise agreements or other agreements as well.

(c) If your rights under this Agreement are terminated by us for your failure to make any payment due under this Agreement, section 14.1 below is not applicable, and we may immediately commence an action under section 14.2 below to collect damages or otherwise enforce our rights.

(d) The description of any default in any notice served by us hereunder upon you in no way precludes us from specifying additional or supplemental defaults in any action, arbitration, mediation, hearing or suit relating to this Agreement or the termination thereof.

**13.4 Description of Default.**
The description of any default in any notice served by us hereunder upon you in no way precludes us from specifying additional or supplemental defaults in any action, arbitration, mediation, hearing or suit relating to this Agreement or the termination thereof.

FBBC FA 08 2019

**13.5 Statutory Limitations.**

Notwithstanding anything to the contrary in this Article XIII, in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Agreement or the parties hereto limits our rights of termination hereunder or requires longer notice periods than those set forth herein, and in the event the parties are prohibited by law from agreeing to the shorter periods set forth herein, then this Agreement will be deemed amended to conform to the requirements of such laws and regulations, but in such event the provisions of the Agreement thus affected will be amended only to the extent necessary to bring it within the requirements of the law or regulation.

**13.6 Extended Cure Period.**

Notwithstanding anything contained herein to the contrary, including, without limitation, section 13.3(c) hereof, in those circumstances under which we have the right to terminate this Agreement, we also have the right, to be exercised in our sole discretion, to grant to you in writing only, in lieu of termination of this Agreement, an extended period of time to cure the breach which gave rise to our right to terminate, but in no event may such extended cure period exceed six months from the last day of the cure period otherwise applicable to such breach. You acknowledge that our election to grant an extended cure period to you will not operate as a waiver of any of our rights hereunder. Further, if we issue you a notice of default for a default that is capable of being cured, and you do not cure the default before the expiration of the cure period stated in the Franchise Agreement for that default, then you may send us a written request for an extension to the cure period and pay to us, along with your written request, a Cure Period Extension Fee of $1,000. We do not have to grant you any extensions. The decision will be in our sole and absolute discretion.

**13.7 Our Right to Cure Your Defaults.**

In addition to all other remedies herein granted, if you default in the performance of any of your obligations or breach any term or condition of this Agreement or any related agreement involving third parties, we may, at our election, immediately or at any time thereafter, without waiving any claim for breach hereunder and without notice to you, cure the default for your account and on your behalf, and all costs or expenses including attorney's fees incurred by us on account thereof are due and payable by you to us on demand.

**13.8 Waiver and Delay.**

No waiver by us of any breach or series of breaches or defaults in performance by you and no failure, refusal or neglect of ours either to exercise any right, power or option given to us hereunder or to insist upon strict compliance with or performance of your obligations under this Agreement or the Brand Standards Manual, constitutes a waiver of the provisions of this Agreement or the Brand Standards Manual with respect to any subsequent breach thereof or a waiver by us of our right at any time thereafter to require exact and strict compliance with the provisions thereof.

**13.9 Recovery of Lost Royalty; Liquidated Damages.**

The parties agree that, if this Agreement is terminated as a result of your default before the expiration of the term, it would be impossible to calculate with reasonable precision, the losses that we would incur because of the unpredictability of future business conditions, inflationary prices, the impact on our and the System's reputation from having a closed location, our ability to replace the Franchised Business in the same market, and other factors. Accordingly, if this Agreement is terminated as a result of any default by you, we shall be entitled to recover as liquidated damages and not as a penalty, an amount equal to the (a) aggregate monthly Royalty fees and Promotional and Marketing Fund Contributions you are required to pay to us under this Agreement; multiplied by (b) 36.

**13.10 Collection Costs.**

We are entitled to reimbursement from you upon our demand of all costs we have incurred (including reasonable attorneys' fees and investigators' fees) to enforce our rights under this Agreement, including actions to collect any amounts due and delinquent hereunder.

**13.11 Continuance of Business Relations.**

Any continuance of business relations between you and us after termination of this Agreement will not be construed as a renewal, extension or continuation of this Agreement.

**XIV.    DISPUTE RESOLUTION**

**14.1 Initial Steps to Resolve a Dispute; Mediation.**

      **(a)** We and you have entered into a long-term franchise relationship which gives rise to an obligation, subject

to and consistent with the terms of this Agreement, to endeavor to make the relationship succeed, considering the overall best interests of the System, and as contemplated by this Agreement. To that end, you and we acknowledge that you and we need to attempt to resolve disagreements or disputes before such disagreements or disputes negatively impact the relationship. Good faith communications between you and us are an important aspect of that obligation. The parties hereby pledge and agree that they will resolve any dispute, claim or controversy (a) arising out of or relating to this Agreement or any alleged breach hereof, including any claim that this Agreement or any part hereof is invalid, illegal or otherwise voidable or void, and / or (b) related to the parties' relationship; and/or (c) events occurring prior to the entry into this Agreement, and/or (d) the Outlet, and/or (e) any System standard (collectively, "Dispute"), in accordance with the dispute resolution procedures set forth in this Agreement. Good faith participation in these procedures to the greatest extent reasonably possible, despite lack of cooperation by one or more of the other parties, is a precondition to maintaining any arbitration or legal action, including any action to interpret or enforce this Agreement.  The parties pledge and agree that they will first attempt to resolve any Dispute by first having our executive officers and your Principal Equity Owners meet in person within five business days (or such longer period as the parties may mutually agree) after a party notifies the other party that a Dispute has arisen at our principal executive office (without our respective legal counsel) to conduct a good faith discussion and negotiation of the issues with a view to resolving the Dispute. We may proceed to terminate this Agreement in either of the following two situations without a settlement meeting or mediation proceeding: (i) if there is any breach of this Agreement by you that may result in an immediate termination of this Agreement pursuant to section 13.2 above, or (ii) if you fail to pay any sums due us under this Agreement which may result in termination of this Agreement pursuant to section 13.3 above. Also, if a party refuses to participate in the settlement meeting or mediation within the respective time frames set forth in this section 14.1, the other party may immediately commence an arbitration proceeding pursuant to section 14.2 below.

**(b)** If we are unable to settle the Dispute at the settlement conference described in section 14.1 above, 10 business days after the date this conference took place (or should have taken place), you and we may submit the dispute to non-binding mediation conducted by a mediator, and at a location, mutually agreeable to both parties; provided however the mediator must be a State Bar of California Board of Legal Specialization Certified Specialist in Franchise and Distribution Law. If the Dispute is not resolved through mediation, then within 10 business days after the conclusion of the mediation, the Dispute may be immediately submitted to binding resolution through arbitration proceedings pursuant to section 14.2 below. Any mediation proceeding should be completed within 45 days following the date either party first gives notice of mediation. The fees and expenses of the mediator will be shared equally by the parties. The mediator will be disqualified as a witness, expert or counsel for any party with respect to the Dispute and any related matter. Mediation is a compromise negotiation and will constitute privileged communications under the law governing this Agreement. The entire mediation process will be confidential and the conduct, statements, promises, offers, views and opinions of the mediator and the parties will not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence which is otherwise discoverable or admissible will not be excluded from discovery or admission because of its use in the mediation.

**14.2 Arbitration.**

**(a)  Except as specifically provided in sections 13.2(b) and 13.3(c) above, any Dispute between us (and/or our affiliated entities) and you (and/or your Principal Equity Owners or affiliated entities) not settled through the procedures described in section 14.1 above will be resolved through binding arbitration by and before JAMS, Inc. in accordance with its Streamlined Arbitration Rules and Procedures (if the amount in controversy is less than $250,000) or its Comprehensive Arbitration Rules and Procedures (if the amount in controversy is $250,000 or more), or if the parties in dispute mutually agree, through binding arbitration by any other mutually agreeable arbitration organization. It is explicitly agreed by each of the parties hereto that no arbitration of any Dispute may be commenced except in accordance with this section 14.2.**

**(b)  All hearings and other proceedings will take place in Orange County, California, or other county where our headquarters is then located, or if we so elect, at the JAMS business location nearest in the county where your (or an applicable Principal Equity Owner's) principal place of business is then located.**

**(c)  Either party may present briefs and affidavits of witnesses who are unable to attend hearings.  A limited amount of discovery is permitted within the discretion of the arbitrator (including affidavits, interrogatories and depositions). The arbitrator will have the right to award or include in the award any relief that the arbitrator deems proper in the circumstances, including money damages (with interest on unpaid amounts from the date due), specific performance and injunctive relief, provided that the arbitrator will not have the right to declare any Mark generic or otherwise invalid or to award punitive damages. If either party**

- 34 -

fails to appear or participate in the arbitration proceeding, the other party will be entitled to a default judgment award. The arbitration award will be final and binding on the parties, and judgment on the award may be entered in any federal or state court having jurisdiction.

(d) TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL CLAIMS BROUGHT UNDER THIS AGREEMENT WILL BE BROUGHT IN AN INDIVIDUAL CAPACITY. THIS AGREEMENT MAY NOT BE CONSTRUED TO ALLOW OR PERMIT THE CONSOLIDATION OR JOINDER OF OTHER CLAIMS OR CONTROVERSIES INVOLVING ANY OTHER FRANCHISEES OR PERMIT SUCH CLAIMS OR CONTROVERSIES TO PROCEED AS A CLASS ACTION, CLASS ARBITRATION, COLLECTIVE ACTION, OR ANY SIMILAR REPRESENTATIVE ACTION. NO ARBITRATOR WILL HAVE THE AUTHORITY UNDER THIS AGREEMENT TO ORDER ANY SUCH CLASS OR REPRESENTATIVE ACTION. BY SIGNING BELOW, YOU ACKNOWLEDGE YOU ARE AGREEING TO WAIVE ANY SUBSTANTIVE OR PROCEDURAL RIGHTS THAT YOU MAY HAVE TO BRING AN ACTION ON A CLASS, COLLECTIVE, REPRESENTATIVE OR OTHER SIMILAR BASIS. ACCORDINGLY, YOU EXPRESSLY AGREE TO WAIVE ANY RIGHT YOU MAY HAVE TO BRING AN ACTION ON A CLASS, COLLECTIVE, REPRESENTATIVE OR OTHER SIMILAR BASIS.

(e) TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PARTIES WAIVE ALL RIGHTS THEY MAY HAVE TO SEEK PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES FROM ONE ANOTHER, EXCEPT THIS WAIVER AND LIMITATION SHALL NOT APPLY WITH RESPECT TO (A) YOUR OBLIGATION TO INDEMNIFY US PURSUANT TO ANY PROVISION OF THIS AGREEMENT; OR (B) ANY CLAIMS WE BRING AGAINST YOU OR ANY OF YOUR OWNERS FOR UNAUTHORIZED USE OF THE MARKS, UNAUTHORIZED DISCLOSURE OR USE OF CONFIDENTIAL INFORMATION, UNFAIR COMPETITION, BREACH OF YOUR NON-COMPETITION COVENANTS AND/OR ANY CAUSE OF ACTION BROUGHT BY US OR ANY OF OUR AFFILIATES UNDER THE LANHAM ACT. ACCORDINGLY, THE ARBITRATOR WILL HAVE NO POWER TO ASSESS PUNITIVE DAMAGES AGAINST EITHER PARTY.

(f) This arbitration provision is deemed to be self-executing and will remain in full force and effect after expiration or termination of this Agreement. If either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear.

(g) The provisions of this section 14.2 are intended to benefit and bind certain third-party non-signatories and will continue in full force and effect notwithstanding any expiration or termination of this Agreement. Furthermore, this section 14.2 will be construed as independent of any other covenant or provision of this Agreement; provided, however, that if a court of competent jurisdiction determines that any of such provisions are unlawful in any way, the court is respectfully requested to modify or interpret such provisions to the minimum extent necessary to comply with the law.

[Our Initials: _____  Your Initials: _____ ]
[Principal Equity Owners' Initials: _____ ]

## 14.3 Injunctive Relief.

Any party has the right in a situation where there is an imminent threat of harm to the legal rights of a party and damages would not be adequate relief to seek a temporary restraining order and temporary or preliminary injunctive relief from a court of competent jurisdiction in California, without the necessity of first complying with sections 14.1 and 14.2 above or posting any bond, and if bond is nevertheless required by a court of competent jurisdiction, the parties agree that the sum of $1,000 will be a sufficient bond (this amount may be adjusted by changes in the Consumer Price Index since the Effective Date). If an arbitration proceeding has already commenced pursuant to section 14.2 above when a party seeks injunctive relief, then the party seeking such injunctive relief agrees to contemporaneously submit the merits of its dispute to the arbitrator. The existence of a proceeding commenced under section 14.1 or 14.2 above will in no event abate or otherwise affect the ability of party to seek injunctive relief under this section 14.3. You acknowledge that failure on your part to comply fully with any of the terms of this Agreement respecting the obligations regarding examinations, audits and the Marks could cause irreparable damage to us or other affiliated persons or entities and we or our affiliates could seek injunctive relief to protect the Marks. This covenant is independent, severable and enforceable notwithstanding any other rights or remedies that any party may have.

## 14.4 Legal Fees and Expenses.

The prevailing party in any arbitration or litigation to resolve a dispute between any of the parties hereto will be entitled to recover from the losing party reasonable legal fees (and incurred costs of the prevailing party's counsel)

- 35 -

and all other "Expenses" (as defined in section 16.2(e) below) incurred by the prevailing party in bringing or defending such arbitration, action or proceeding and/or enforcing any resulting award or judgment (including without limitation arbitration or court filing fees, expert and other witness fees, discovery expenses and compensation payable to the arbitrator), whether incurred prior to or in preparation for or in contemplation of the filing of the action or thereafter. The prevailing party will be determined by the arbitrator or court. This section 14.4 is intended to be expressly severable from the other provisions of this Agreement, is intended to survive any judgment and is not to be deemed merged into the judgment.

**14.5 Survival.**
The terms of this Article XIV survive termination, expiration or cancellation of this Agreement.

**14.6 Limitation of Action.**
Except for claims arising from your non-payment or underpayment of amounts you owe to us or our affiliates, or claims related to your unauthorized use of the Marks, any and all claims arising out of or related to this Agreement or the relationship of the parties will be barred unless a judicial or arbitration proceeding, as required under this Agreement, is commenced within one (1) year from the date on which the party asserting such claim knew or should have known of the facts giving rise to such claims, and that any action not so brought shall be barred, whether as a claim, counterclaim, defense or setoff. Without limiting the foregoing, you acknowledge and agree that you may not maintain any action against us or any of our owners, employees, directors, officers, shareholders, affiliates, parents, successors or assigns unless (a) you deliver written notice of any claim to the other party within one hundred eighty (180) days after the event complained of becomes known to you, and (b) you strictly adhere to the negotiation, mediation and arbitration procedures set forth in this Agreement.

## XV. OBLIGATIONS AND RIGHTS UPON TERMINATION OR EXPIRATION

**15.1 Your Obligations.**

(a)        If there is a termination, cancellation or expiration of this Agreement (whether by reason of your breach, default, non-renewal, lapse of time or other cause), in addition to any other obligations provided for in this Agreement, you must forthwith discontinue the use or display of the Marks in any manner whatsoever, and you may not thereafter operate or do business under the Marks or any other Fit Body Boot Camp brand or any other name or in any manner that might tend to give the general public the impression that you are in any way associated or affiliates with us, or any of the businesses conducted by us or the owner of the Marks, including without limitation repainting the business premises in a distinctively different color and removing or rearranging distinctive elements of the Fit Body Boot Camp trade dress. You must contact online business review sites and other online directories and websites, and request the removal of all use of the trademarks relating to the former Fit Body Boot Camp outlet (and the physical address of the former Fit Body Boot Camp outlet) and all use of former reviews from the period you were a Fit Body Boot Camp franchisee. And, you also must comply with section 15.2 respecting the return to us of certain materials and must not thereafter use, in any manner, or for any purpose, directly or indirectly, any of our trade secrets, procedures, techniques, or materials acquired by you by virtue of the relationship established by this Agreement, including, without limitation, (i) any training or other materials, manuals, bulletins, instruction sheets, or supplements thereto, or (ii) any equipment, videotapes, videodiscs, forms, advertising matter, devices, insignias, slogans or designs used from time to time in connection with the Franchised Business.

(b) If there is a termination, cancellation or expiration as described in section 15.1(a) above, you must comply with section 11.2 of this Agreement respecting post-termination competition and promptly:

(i) Remove at your expense all signs erected or used by you and bearing the Marks, or any word or mark indicating that you are associated or affiliated with us;

(ii) Erase or obliterate from letterheads, stationery, printed matter, advertising or other forms used by you the Marks and all words indicating that you are associated or affiliated with us;

(iii) Permanently discontinue all advertising of yours that states or implies that you are associated or affiliated with us or the System;

(iv) If you engage in any business thereafter, you must use trade names, service marks or trademarks that are significantly different from those under which you had done business and must use sign formats

- 36 -

that are significantly different in color and type face; and take all necessary steps to ensure that your present and former employees, agents, officers, shareholders and partners observe the foregoing obligations;

(v) Assign all interest and right to use all telephone numbers and all listings applicable to the Outlet in use at the time of such termination to us and take all action necessary to change all such telephone numbers immediately and change all such listings as soon as possible;

(vi) At our option, assign to us or our designee, any interest which you have in any lease for the Franchised Business. If we do not require you to assign the lease to us or our designee, you shall make all modifications, changes and alterations to the interior and exterior of the premises, as we may direct, so as to completely de-identify the premises from the System;

(vii) You shall immediately pay all sums owing to us and our subsidiaries and affiliates, including Royalty Fees and Marketing and Promotion Fund Contributions, interest on any of the foregoing, and all other amounts owed to us that are then unpaid.

(c) If you fail or omit to make or cause to be made any removal or change described in section 15.1(b)(i) through 15.1(b)(vi) above, then we will have the right within 15 days after written notice to enter your Outlet or other premises from which the Franchised Business is being conducted without being deemed guilty of trespass or any other tort, and make or cause to be made such removal and changes at your expense, which expenses you agree to pay to us promptly upon demand; and you hereby irrevocably appoint us as your lawful attorney upon termination of this Agreement with authority to file any document in the name of and on our behalf for the purpose of terminating any and all of your rights in any trade name you have used that contains any of the Marks.

**15.2 Our Rights as Franchisor.**

(a) The termination, cancellation, expiration or assignment of this Agreement will be without prejudice to any rights of us against you and such termination, cancellation, expiration or assignment will not relieve you of any of your obligations to us existing at the time of termination, cancellation, expiration or assignment or terminate those obligations of ours which, by their nature, survive the termination, cancellation, expiration or assignment of this Agreement.

(b) We may direct that all applicable suppliers immediately cease providing you with equipment, marketing materials, e-mail access, website access, accessories and other items comprising or to be used to provide Fit Body Boot Camp Services and Products.

(c) You are obligated to return, at no expense to us, any and all copies of the Brand Standards Manual and all other Fit Body Boot Camp proprietary materials and any other items that were supplied by us for your use without additional charge in connection with the operation of the Franchised Business. You must also permanently erase anything relating to us or the Franchised Business from any computers and other media storage devices you retain after expiration, cancellation or termination of this Agreement.

(d) Within 30 days after termination, expiration or non-renewal of this Agreement, we will have the option, but not the obligation, to purchase all or any portion of your reusable inventory, apparel containing the Marks, proprietary equipment, parts, fixtures and furnishings owned and used by you in your franchised operation. We will be permitted to deduct and withdraw from the purchase price to be paid to you all sums then due and owing to us. The purchase price for your inventory of apparel containing the Marks will be at your cost for said items. The purchase price for the proprietary equipment, parts, fixtures and furnishings will be the fair market value thereof as we mutually determine. In determining the fair market value of such items, you and we agree to exclude any factor or increment for goodwill or going concern value. The purchase price to be paid to you will be paid in cash at the closing of any purchase that will occur no less than 30 days from the date we exercise our option, unless you and we are unable to agree on the fair market value of the assets to be purchased. If you and we are unable to reach agreement within a reasonable time as to the fair market value of the items we have agreed to purchase, we will designate an independent appraiser, and the appraiser's determination will be binding. You and we must each pay 50% of the fee charged by the independent appraiser.

**XVI.    GENERAL TERMS AND PROVISIONS**

**16.1 Notices.**

(a) All notices that the parties hereto are required or may desire to give under this Agreement will be in writing and (unless personally delivered by an agent of the sending party) must be sent by reliable overnight courier, for delivery on the next business day and addressed as follows:

(i) If to us:

FIT BODY BOOT CAMP, INC.
5867 PINE AVE
CHINO HILLS CA 91709-6531
Phone: (888) 638-3222

If to you, the Outlet address or your most current principal business address of which you have notified us in writing.

(b) Unless previously delivered in person by an agent of the sending party, notices between you and us will be deemed given the next business day after deposit with a reliable overnight courier, properly addressed and marked for delivery on the next business day.

(c) Any change in the addresses listed in section 16.1(a) above must be sent to the other party as soon as practicable after the change occurs by reliable overnight courier.

(d) Any notices sent to you which include a statement of intent to terminate or not renew the Franchise must provide (i) the reasons why and (ii) the effective date of such termination or nonrenewal or expiration.

**16.2 Indemnity.**

(a) You and your owners, jointly and severally, hereby agree to protect, defend and indemnify us, and all of our past, present and future owners, affiliates, officers, directors, shareholders, employees, attorneys and designees, and each of them, and hold them harmless from and against any and all Losses directly or indirectly arising out of, related to, or in connection with any "Proceeding" (as defined in section 16.2(f) below) concerning: (a) the Outlet; (b) your development, maintenance or operation of the Outlet; (c) any breach of this Agreement; and/or (d) the Franchised Business, except if caused by our intentional misfeasance or gross negligence. This indemnity will continue in effect after the expiration, transfer or termination of this Agreement. Under no circumstances will we or any other indemnified party under this paragraph, be required to seek recovery from any insurer or other third party, or otherwise to mitigate their or our losses or expenses, in order to maintain and fully recover a claim against you or any of your owners.

(b) For the indemnification to be effective, each indemnified party ("Indemnified Party") will give the indemnifying party ("Indemnifying Party") reasonable notice of each claim or loss for which the Indemnified Party demands indemnity and defense, except that failure to provide such notice will not release the Indemnifying Party from any obligations hereunder except to the extent that the Indemnifying Party is materially prejudiced by such failure. The Indemnifying Party will assume, at its sole cost and expense, the defense of such Proceeding through legal counsel reasonably acceptable to the Indemnified Party, except that the Indemnified Party may at its option and expense select and be represented by separate counsel. The Indemnifying Party will have control over the Proceeding, including the right to settle; provided, however, the Indemnifying Party will not, absent the written consent of the Indemnified Party, consent to the entry of any judgment or enter into any settlement that: (i) provides for any admission of liability on the part of the Indemnified Party or relief other than the payment of monetary damages for which the Indemnifying Party will be solely liable; or (ii) adversely affects the rights of the Indemnified Party under this Agreement, or (iii) does not release the Indemnified Party from all Proceedings and "Losses" (as defined in section 16.2(d) below) in respect thereof.  In no event will the Indemnified Party be liable for any Losses that are compromised or settled in violation of this section 16.2. The Indemnifying Party's duty to defend is independent of its duty to indemnify. Each indemnified party must submit all its claims to its insurers in a timely manner. Any payments made by an indemnified party will be net of benefits received by any indemnified party from insurance in respect of such claims.

(c) The term "Losses" means, refers to, and includes all "Expenses" (as defined in section 16.2(e) below), liabilities, obligations, losses, fines, penalties, costs, or damages including all reasonable out of pocket fees and

disbursements of legal counsel in the investigation or defense of any of the same or in asserting any party's respective rights hereunder but excluding punitive damages (unless resulting from third party claims).

(d) The term "Expenses" means, refers to, and includes, all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding casts, telephone charges, postage, delivery service fees and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery in any Proceeding. Expenses will also include Expenses incurred from any appeal resulting from any Proceeding and any federal, state, local or foreign taxes imposed on the Indemnitee because of the actual or deemed receipt of any payments under this Agreements, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond, or other appeal bond or its equivalent.

(e)The term "Proceeding" means, refers to, and includes any threatened pending or completed suit, claim, demand, action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether civil, criminal, administrative or investigative.

### 16.3 Your Relationship to Us as Franchisee.

(a) It is expressly agreed that the parties intend by this Agreement to establish between you and us the relationship of franchisee and franchisor. It is further agreed that you have no authority to create or assume in our name or on our behalf, any obligation, express or implied, or to act or purport to act as agent or representative on our behalf for any purpose whatsoever. Neither you nor we are the employer, employee, agent, partner, fiduciary or co-venturer of or with the other, each being independent. You agree that you will not hold yourself out as our agent, employee, partner or co-venturer or the Owner of the Marks. All employees or agents hired or engaged by or working for you will be only the employees or agents of yours and will not for any purpose be deemed employees or agents of ours or the Owner of the Marks, nor subject to our control; and in particular, we will have no authority to exercise control over the hiring or termination of these employees, independent contractors, or others who work for you, their compensation, working hours or conditions, or their day-to-day activities, except to the extent necessary to protect the Marks. You agree to diligently consider customer reviews and respond to customer indications of dissatisfaction with services rendered by you in a diligent and professional manner and agree to cooperate with representatives of ours or the Owner of the Marks in any investigation undertaken by us of complaints respecting your activities. You and we agree to file our own tax, regulatory and payroll reports with respect to our respective employees or agents and operations, saving and indemnifying the other party hereto of and from any liability of any nature whatsoever by virtue thereof.

(b) During the term of this Agreement (and any renewals hereof), you and your Principal Equity Owners jointly and severally (i) covenant to refrain from making any derogatory and/or disparaging statements to any other person or third parties or regulatory authorities about us, any of our officers, managers, employees or agents, or the Fit Body Boot Camp franchise system, and (ii) agree not to issue any public statement or otherwise cause to be disclosed any information that is designed, intended or might reasonably be anticipated to have a negative effect on the Fit Body Boot Camp franchise system, us, or any of our officers, managers, employees or agents. Any violation of the terms of this section 16.3(b) by you or a Principal Equity Owner will be deemed a material breach of this Agreement.

### 16.4 No Third-Party Beneficiaries.

This Agreement is not intended to benefit any other person or entity except the named parties hereto and no other person or entity (other than financing sources to whom we may have granted or consented to a collateral assignment of this Agreement) will be entitled to any rights hereunder due to so-called "third party beneficiary rights" or otherwise.

### 16.5 Survival of Covenants.

The covenants contained in this Agreement that by their terms require performance by the parties after the expiration or termination of this Agreement will be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

### 16.6 Successors and Assigns.

This Agreement is binding upon (i) us and inures to the benefit of our successors and assigns and (ii) you and inures to the benefit of your successors and assigns, subject to the restrictions on Assignment by You contained herein.

**16.7 Joint and Several Liabilities.**
If the entity that is the franchisee under this Agreement consists of more than one person or entity, or a combination thereof, the obligations and liabilities of each such person or entity to us are joint and several.

**16.8 Titles for Convenience Only.**
Section titles used in this Agreement are for convenience only and do not affect the meaning or construction of any of the terms, provisions, covenants or conditions of this Agreement.

**16.9 Gender.**
All terms used in any one number or gender will extend to mean and include any other number and gender as the facts, context or sense of this Agreement or any section may require.

**16.10 Severability; Partial Invalidity.**
Nothing contained in this Agreement will be construed as requiring the commission of any act contrary to law. Whenever there is any conflict between (i) any provisions of this Agreement or the Brand Standards Manual and (ii) any present or future statute, law, ordinance, regulation or judicial decision, contrary to which the parties have no legal right under this Agreement, the latter will prevail, but in such event the provision of this Agreement or the Brand Standards Manual thus affected will be curtailed and limited only to the extent necessary to bring it within the requirements of the law. In the event that any part, article, section, sentence or clause of this Agreement or the Brand Standards Manual is held to be indefinite, invalid or otherwise unenforceable, that specific language will be deemed deleted but the remaining parts thereof will continue in full force and effect.

**16.11 Counterparts.**
This Agreement may be executed in multiple copies, each of which will be deemed to be an original, and both of which together will be deemed to be one and the same instrument.

**16.12 Compliance with U.S. Anti-Terrorism and Other U.S. Federal Laws.**

(a)   You and each of the Principal Equity Owners certify that none of you, the Principal Equity Owners, employees, or anyone associated with you is listed in the Annex to Executive Order 13224 (available at http://treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html). You covenant not to hire or have any dealings with a person listed in the Annex. You certify that you have no knowledge or information that, if generally known, would result in you, the Principal Equity Owners, employees or anyone associated with you being listed in the Annex to Executive Order 13224. You and each of the Principal Equity Owners will comply with and assist us to the fullest extent possible in our efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, you, and each of the Principal Equity Owners certify, represent and warrant that none of your respective property or interests is subject to being "blocked" under any of the Anti-Terrorism Laws and that you and the Principal Equity Owners are not otherwise in violation of any of the Anti-Terrorism Laws. You are solely responsible for ascertaining what actions must be taken by you to comply with all such Anti-Terrorism Laws. You specifically acknowledge and agree that your indemnification responsibilities as provided in this Agreement pertain to your obligations under this section 16.12. Any misrepresentation by you under this section 16.12 or any violation of the Anti-Terrorism Laws by you, any of the Principal Equity Owners, or employees will constitute grounds for immediate termination of this Agreement and any other agreement you entered into with us or one of our Affiliates. "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists, and any other requirements of any United States governmental authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

(b) Neither you nor any Principal Equity Owner conducts any activity, or has failed to conduct any activity, if such action or inaction constitutes a money laundering crime, including any money laundering crime prohibited under any applicable Anti-Terror Legislation.

(c) Neither you nor any Principal Equity Owner nor any employee of either is named as a "Specially Designated National" or "Blocked Person" as designated by the U.S. Department of the Treasury's Office of Foreign Assets Control, and published at www.treas.gov/offices/enforcement/ofac/sdn/. You acknowledge that you are not

directly or indirectly owned or controlled by the government of any country that is subject to a United States embargo, nor do you or any Principal Equity Owner act directly or indirectly on behalf of the government of any country that is subject to a United States embargo. You and the Principal Equity Owners agree that you will notify us in writing immediately of the occurrence of any event that renders the foregoing representations and warranties of this section 16.12 incorrect.

[Your Initials: _____  Principal Equity Owners' Initials: _____ _____ _____ ]

**16.13 Governing Law.**
The Federal Arbitration Act (9 U.S.C. §1 *et seq.*) governs the arbitration of disputes under this Agreement. Otherwise, the laws of the state in which the Outlet is located or intended to be located shall govern this Agreement and all related matters, documents and agreements, without regard to conflicts of laws. If any provision of this Agreement is impermissible under a governing law, the provision will be deemed amended to conform to that law while maintaining to the maximum extent possible the original intent of the provision, or if the provision as amended cannot substantially maintain the original intent, then the provision will be deemed deleted.

**16.14 Entire Agreement.**

(a) The parties to this Agreement each acknowledge and warrant to each other that they wish to have all terms of this business relationship defined solely in and by this written Agreement and the Brand Standards Manual. Recognizing the costs on all parties which attend uncertainty, the signatories to this Agreement each confirm that neither wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements or non-contract writings (which have been or may in the future be exchanged between them) serve as the basis for creating rights or obligations different than or supplementary to the rights and obligations set forth herein. Accordingly, the signatories each agree and promise each other that this Agreement, the Brand Standards Manual, and the representations made by us in the Fit Body Boot Camp Franchise Disclosure Document ("FDD") provided to you, supersede and cancel any prior and/or contemporaneous discussions or writings (whether described as representations, inducements, promises, agreements, understandings or any other term), by any of the parties or by anyone acting on his, her or their behalf, with respect to the rights and obligations of the parties to this Agreement or the relationship between them. Each signatory to this Agreement agrees and promises the other that they have placed, and will place, no reliance on any such discussions or writings.

(b) In accordance with the foregoing section 16.14(a), the parties to this Agreement agree that this Agreement, and the Brand Standards Manual, constitutes the entire agreement between the parties and contain all of the terms, conditions, rights and obligations of the parties with respect to the franchised business contemplated by this Agreement and any other aspect of the relationship between the parties; provided however, that nothing in this Agreement or in any related agreement or writing is intended to disclaim the representations made in the FDD that was provided to you.

(c) This Agreement cannot be modified or changed except by written instrument signed by all of the parties hereto.

**XVII.    EFFECTIVENESS OF AGREEMENT**

This Agreement will become effective only upon the execution thereof by you and by us, and only after you were furnished with an FDD. HOWEVER, THIS AGREEMENT IS NOT BINDING ON US UNLESS AND UNTIL IT HAS BEEN ACCEPTED AND SIGNED BY US.

**XVIII.    ACKNOWLEDGMENTS AND REPRESENTATIONS**

**18.1 Acknowledgments and Representations.**

(a) You and each of your Principal Equity Owners represent and warrant that the following statements in this section 18.1 are true and accurate.

(b) You do not seek to obtain the Franchise for speculative or investment purposes and have no present intention to sell or transfer or attempt to sell or transfer the Franchised Business or the Franchise within 12 months after the Opening Date.

(c) You understand and acknowledge the value to the System of uniform and ethical standards of quality,

- 41 -

appearance and service described in and required by the Brand Standards Manual and the necessity of operating the Franchised Business under the standards set forth in the Brand Standards Manual. You represent that you have the capabilities, professionally, financially and otherwise, to comply with our standards.

(d) If you are an entity, you are duly organized and qualified to do business in the state and any other applicable jurisdiction within which the Outlet is located.

(e) Your execution of this Agreement will not constitute or violate any other agreement or commitment to which you are a party.

(f) Any individual executing this Agreement on your behalf is duly authorized to do so and the Agreement constitutes a valid and binding obligation of yours and all of your Principal Equity Owners.

(g) You and your Principal Equity Owners (i) have carefully read this Agreement and all other related documents to be executed by you concurrently or in conjunction with the execution hereof, (ii) have conducted an independent investigation of the business contemplated by this Agreement, (iii) have obtained, or had the opportunity to obtain, the advice of counsel in connection with the execution and delivery of this Agreement, (iv) understand the nature of this Agreement, and (v) intend to comply herewith and be bound hereby. You also recognize that the Franchise involves significant risks, making the success of the Outlet largely dependent on your abilities and attention. We expressly disclaim the making of, and you agree that you have not received or relied on, any representation or warranty from us regarding the likelihood of your success at your Outlet or in your operating the Franchised Business.

(h) In entering into this Agreement, you have not relied on any representation by us, or any of our officers, managers, partners, shareholders, employees or agents concerning the Franchised Business that is contrary to (i) the terms of this Agreement, (ii) the documents incorporated into this Agreement (or attached to it), or (iii) or the FDD that was provided to you.

(i) You agree that complete and detailed uniformity among our franchisees under varying conditions may be inadvisable, impractical or impossible, and accordingly agree that we, in our sole discretion, may modify or vary aspects of the System as to any franchisee or group of franchisees based on, for example, local sales potential, demographics, competition, business practices or other conditions. You further agree that we will have no obligation to disclose or offer the same or similar variances to you. You are aware that other Fit Body Boot Camp franchisees may operate under different agreements and, consequently, that our obligations and rights as to those franchisees may differ materially in certain circumstances.

(j) You received an FDD and a copy of this Agreement at least 15 calendar days before you signed this Agreement.

(k) You made no payment to us before you signed this Agreement.

(l) You and each Principal Equity Owner acknowledge that in operating the System, we must consider the needs of the System and the need to protect the Marks, even if our actions are contrary to your individual interests as a franchisee.

(m) You and each Principal Equity Owner acknowledge that the success of the business venture is speculative and depends in large part on your participation in the daily affairs of the Franchised Business.

**18.2 Additional Information Respecting You and Your Principal Equity Owners.**

(a) Attached as Exhibit 2 is a schedule containing complete information respecting your Principal Equity Owners.

(b) The name, phone number and email address of your Principal Equity Owner who will be your primary contact person when interacting with us about this Agreement or the Franchise is:

Justin Smith

(858) 735-4310          MYUSERNAMEIS222@gmail.com

(c) The name, phone number and email address of your Principal Equity Owner who will be guaranteeing the lease or rental agreement for your Outlet is:

Justin Smith

(858) 735-4310          MYUSERNAMEIS222@gmail.com

(d) The address (written notice of any change in this information after the Effective Date must be delivered to us pursuant to section 16.1 hereof) where your financial and other records are maintained is either [ ] the same address as provided in section 16.1 hereof, or [ ] the following address:

16520 Green Valley Truck TRL,
Ramona, CA 92065

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

- 43 -

IN WITNESS WHEREOF, and each signatory being jointly and severally liable, the parties hereto executed this Agreement as of the Effective Date:

YOU:                                                          US:

Justin Smith                                                 FIT BODY BOOT CAMP, INC.
_____

By: _____          By: _____
Justin Smith                                                 Bedros Keuilian
_____              _____
[PRINTED NAME AND TITLE]  Owner/Operator     [PRINTED NAME AND TITLE]
                                                             CEO

PRINCIPAL EQUITY OWNERS:

(*Note: each Principal Equity Owner is signing below as a party to this Agreement, and is individually obligated to perform or guarantee the performance by an entity franchisee of all duties and obligations of the franchisee under this Agreement*):

x _____
Justin Smith
_____
[PRINTED NAME]

x _____

_____
[PRINTED NAME]

x _____

_____
[PRINTED NAME]

x _____

_____
[PRINTED NAME]

x _____

_____
[PRINTED NAME]

- 44 -

List of Exhibits to Franchise Agreement:

       Exhibit 1 – Territory and Location of Outlet

       Exhibit 2 – Names and Addresses of Principal Equity Owners

       Exhibit 3 – Assignment and Assumption Agreement; Release

       Exhibit 4 – Lease Rider & Collateral Assignment of Lease

**EXHIBIT 1 - TERRITORY AND LOCATION OF OUTLET**

1.    <u>Approved Outlet Location</u>: The Franchised Outlet will be located at (check (a) or (b), as applicable):

    <u>  X   </u> a. <u>13125 Danielson Street Suite 101 Poway, CA 92064</u>
             (Street Address, City, State and Zip Code)

    <u>        </u> b. The approved Outlet location has not been determined as of the Effective Date of this Agreement. Franchisee shall secure the approved Outlet location in accordance with the terms and conditions of the Franchise Agreement within the general area described as follows (the "Designated Area"):

_____

(Indicate City, County or Area within which the Franchised Outlet shall be located.)

***If (b) above is selected, Franchisor will issue an amended Exhibit 1 to reflect the address of the Outlet and the Territory, once the approved Outlet location is secured by Franchisee in accordance with the terms of the Franchise Agreement.***

2.    <u>Territory</u>.
The Territory is either [ ] a radius of_____miles around the Outlet or [x] the geographical area surrounding the Outlet as depicted in a map attached to this Exhibit 1.

***(If the address of the Outlet is unknown when this Agreement is signed, Franchisor will issue an amended Exhibit 1 to reflect the Territory once the approved Outlet location is secured by Franchisee in accordance with the terms of this Agreement.)***

The Outlet must be open and operating not later than_____<u>3/11/2020</u>_____.

### EXHIBIT 2 - NAMES AND ADDRESSES OF OWNERS AND RESPONSIBLE OWNER

If you are a corporation or limited liability company, list below the names, residential addresses and respective percentage equity ownership interests of each Owner:

1. Justin Smith

   16520 Green Valley Truck
   TRL, Ramona, CA 92065

   _100_ %

2. _____

3. _____

   _____ %

4. _____

   _____ %

5. _____

   _____ %

**The Responsible Owner for the Outlet is the following individual (list name, address, telephone number and email address):**

**Name:** Justin Smith

**Address:** 16520 Green Valley Truck
TRL, Ramona, CA 92065

**Telephone Number:** (858) 735-4310

**Email Address:** MYUSERNAMEIS222@gmail.com

## APPENDIX FOR CALIFORNIA FRANCHISEES

1. THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

2. OUR WEBSITE, www.fitbodybootcamp.com, HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT. ANY COMPLAINTS CONCERNING THE CONTENT OF THE WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT AT www.dbo.ca.gov

3. California Business and Professions Code sections 20000 through 20043 (the "Act") provide rights to you concerning termination, transfer or non-renewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the Act, the Act will control.

4. Section 31125 of the California Corporations Code requires the franchisor to give you a disclosure document, in a form and containing information that the Commissioner of the Department of Business Oversight may by rule or order require, before solicitation of a proposed material modification of an existing franchise.

5. The Franchise Agreement requires binding arbitration. The arbitration will occur in Orange County, California with the costs being borne equally by both parties but reimbursable to the prevailing party. Franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code section 20040.5, Code of Civil Procedure section 1281 and the Federal Arbitration Act) to any provision of a franchise agreement that restricts venue to a forum outside of California.

6. The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. §101 *et seq.*)

7. The Franchise Agreement contains a covenant not to compete that extends beyond the termination or transfer of the franchise. This provision may not be enforceable under California Law.

8. The Franchise Agreement requires you to execute a general release of claims upon renewal or transfer of the Franchise Agreement. California Corporations Code section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order is void. Section 31512 voids a waiver of your rights under the Franchise Investment Law (Corporations Code §§31000-31516). Business and Professions Code section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code §§20000-20043).

9. THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

10. The agreements contain a liquidated damage clause, under Civil Code, Section 1671, certain liquidated damage clauses are enforceable.

11. OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT AT www.dbo.ca.gov.

12. Neither the franchisor, nor any person or franchise broker listed in Item 2 of the disclosure document is subject to any currently effective order of any national securities association or national securities exchange as defined in the Securities Exchange Act of 1934 (15 U.S.C.A. §78A *et seq.*), suspending or expelling these persons from membership in such association or exchange.

1

**<u>EXHIBIT B</u>**

2

3

4

**DEFAULT NOTICE**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BERGER
◆
HARRISON



December 1, 2022

Lane Fisher*

Jeffrey Zucker*

William Graefe, Jr.*

JoyAnn Kenny†

Frank A. Reino‡

Joseph A. Brooks§

Michael Foster**

Anthony Gruzdis*

Daniel Nussbaum⁓

*member PA and NJ bars
† member PA, NJ, and FL bars
‡ member PA, NJ, and WI bars
§ member PA bar
** member NJ bar
⁓ admission pending PA bar

*__Via Electronic Mail and UPS Overnight__*
Justin Smith
16520 Green Valley Truck TRL
Ramona, CA 92065
justin@getsmithfit.com
justin@smfitbody.com

**Re:**   __Notice of Default of Fit Body Boot Camp Franchise Agreement;__
__Demand to Cease and Desist Operation of Competitive Business and__
__Ongoing Trademark Infringement__

Dear Mr. Smith:

I represent Fit Body Boot Camp, Inc ("FBBC"). I am writing to you because you recently communicated to FBBC: (a) your intention to cease complying with the Franchise Agreement that you entered into with FBBC on March 11, 2020 (the Franchise Agreement") pursuant to which you obtained the right and undertook the obligation to operate a Fit Body Boot Camp franchised business (the "Franchised Business"); and (b) your intention to operate a Competing Business at the same location as your Franchised Business, namely at 2892 South Santa Fe Avenue STE 110, San Marcos, California 92069 (the "Premises"). Capitalized terms not defined herein have the definition provided to them in the Franchise Agreement.

<u>Notice of Default</u>

You are in material breach of the Franchise Agreement. Pursuant to the Franchise Agreement, you are required to pay monthly Royalty, Software Reimbursement, and Marketing and Promotion Fees. As of the date of this notice, you have failed to pay $3,094.00 in required Fees.

Additionally, you communicated your desire to operate a Competing Business in violation of the Exclusive In-Term Dealing covenant in Section 11.1 of the Franchise Agreement. Visits to the website https://getsmithfit.com/ indicate that you have begun operating that Competing Business. California courts have held that <u>in-term</u> "exclusive-dealing contracts are not necessarily invalid" in the franchise context. *Quidel Corp. v. Superior Ct. of San Diego Cnty.*, 57 Cal. App. 5th 155, 271 Cal. Rptr. 3d 237 (2020) (citing *Dayton Time Lock Serv., Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d 1, 124 Cal. Rptr. 678 (Ct. App. 1975). Additionally, California courts will enforce non-competition agreements when a party engages in unfair competition, such as by utilizing trade secrets. *Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034 (N.D. Cal. 1990).

Given that your Term does not expire until March 11, 2027 and that visits to https://getsmithfit.com/ indicate you are utilizing similar fitness and marketing methods as those employed by FBBC, FBBC believes you have may have appropriated trade secrets and will be entitled to enforce both the in-term and, if the Franchise Agreement is terminated, post-term non-

21 S. 21st Street
Philadelphia, PA  19103
P: 215.825.3100
F: 215.825.3101

811 Church Road
Suite 105
Cherry Hill, NJ  08002
P: 856.665.5253
F: 856.488.2108





competition covenants pursuant to Sections 11.1 and 11.2 of the Franchise Agreement.

It has also come to FBBC's attention that you are utilizing the Marks in connection with the Franchised Business. Pursuant to Section 9.1(b) of the Franchise Agreement, the Marks were licensed to you only for use in the FBBC System. As of the date of this notice, you are currently using the Marks to market the Competing Business on the website https://getsmithfit.com/, as shown in the screenshots below taken on November 23, 2022. Accordingly, your unauthorized use of the Marks in connection with the operation of a competitive business at the Premises constitutes a clear and unequivocal violation of the Franchise Agreement and the Federal Lanham Act, 15 U.S.C. § 1051 et seq., giving rise to treble damages and attorneys' fees.





<u>Demand to Cure; Cease and Desist Demand</u>

As explained above, your operation of the Competing Business and nonpayment of required fees totaling $3,094.00 constitute material breaches of the Franchise Agreement; accordingly, FBBC hereby demands that you cure such breaches within thirty (30) days of this Demand.




Additionally, FBBC hereby demands that you immediately cease and desist from: (a) any and all use of the Smith Health & Fitness mark and any other unauthorized mark; (b) misusing any of the Marks, including, without limitation the unauthorized use of the Marks while simultaneously making use of any unauthorized marks; (c) engaging in any conduct that constitutes unauthorized use of any of FBBC's intellectual property, including any and all information to which any of you are privy by virtue of your franchise relationship with FBBC; (d) engaging in any and all conduct that violates any of your contractual obligations under the Franchise Agreements; and (e) engaging in any activity that otherwise violates any of FBBC's rights under federal or state law, including the Lanham Act, the Defend Trade Secrets Act and copyright regulations.

**If you fail to comply with the foregoing demands, we will advise our client to take the necessary actions to exercise and protect its rights under applicable law, including but not limited to, terminating the Franchise Agreement, filing a preliminary injunction to enjoin the operation of the Competing Business and use of the Marks, and/or filing a breach of contract action against you.**

Reservation of Rights

This Notice is not intended to be, and should not be construed as, a waiver of FBBC's rights under the Franchise Agreement and applicable law for these or any other violations, which rights are expressly reserved. **Due to the serious nature of this matter, I suggest you give it your immediate attention.**

Very truly yours,

**FISHER ZUCKER LLC**

/s JoyAnn Kenny_____
JoyAnn Kenny

# **EXHIBIT C**

## **STATEMENT OF AMOUNT OWED**

BERGER
◆
HARRISON

**Fit Body Boot Camp, Inc.**

5867 Pine Avenue
Chino Hills, CA  91709 US
888-638-3222
ashley@fitbodybootcamp.com

# Statement

**TO**

13961709 Justin Smith
San Marcos Fit Body Boot
Camp
16520 Green Valley Truck TRL
Ramona, CA  92065 USA

**STATEMENT NO.**  2001
**DATE**  03/16/2023
**TOTAL DUE**  $10,382.00
**ENCLOSED**

| DATE | ACTIVITY | AMOUNT | OPEN AMOUNT |
|---|---|---|---|
| 10/10/2022 | Invoice #44930: Due 10/10/2022. Oct 2022 Franchise Software Fees | 300.00 | 300.00 |
| 10/17/2022 | Invoice #45181: Due 10/17/2022. Oct 2022 Franchise Royalty Fees | 997.00 | 997.00 |
| 11/01/2022 | Invoice #45516: Due 11/01/2022. Nov 2022 Franchise Marketing Fees | 500.00 | 500.00 |
| 11/10/2022 | Invoice #45763: Due 11/10/2022. Nov 2022 Franchise Software Fees | 300.00 | 300.00 |
| 11/17/2022 | Invoice #46007: Due 11/17/2022. Nov 2022 Franchise Royalty Fees | 997.00 | 997.00 |
| 12/01/2022 | Invoice #46340: Due 12/01/2022. Dec 2022 Franchise Marketing Fees | 500.00 | 500.00 |
| 12/10/2022 | Invoice #46592: Due 12/10/2022. Dec 2022 Franchise Software Fees | 300.00 | 300.00 |
| 12/17/2022 | Invoice #46840: Due 12/17/2022. Dec 2022 Franchise Royalty Fees | 997.00 | 997.00 |
| 01/01/2023 | Invoice #47163: Due 01/01/2023. Jan 2023 Franchise Marketing Fees | 500.00 | 500.00 |
| 01/10/2023 | Invoice #47401: Due 01/10/2023. Jan 2023 Franchise Software Fees | 300.00 | 300.00 |
| 01/17/2023 | Invoice #47640: Due 01/17/2023. Jan 2023 Franchise Royalty Fees | 997.00 | 997.00 |
| 02/01/2023 | Invoice #47899: Due 02/01/2023. Feb 2023 Franchise Marketing Fees | 500.00 | 500.00 |
| 02/10/2023 | Invoice #48233: Due 02/10/2023. Feb 2023 Franchise Software Fees | 300.00 | 300.00 |
| 02/17/2023 | Invoice #48477: Due 02/17/2023. Feb 2023 Franchise Royalty Fees | 997.00 | 997.00 |
| 03/01/2023 | Invoice #48810: Due 03/01/2023. March 2023 Franchise Marketing Fees | 500.00 | 500.00 |
| 03/10/2023 | Invoice #49056: Due 03/10/2023. March 2023 Franchise Software Fees | 400.00 | 400.00 |

| DATE | ACTIVITY | AMOUNT | OPEN AMOUNT |
|------|----------|--------|-------------|
| 03/16/2023 | Invoice #49203: Due 03/16/2023. March 2023 Franchise Royalty Fees | 997.00 | 997.00 |

AMOUNT DUE
$10,382.00